**AUTOMATIC DEVICES CORPORATION v. SINKO TOOL & MFG. CO.**
(two cases).

**Nos. 7103, 7104.**

Circuit Court of Appeals, Seventh Circuit.
April 27, 1940.

Rehearing Denied June 18, 1940.

---

2 See footnote 1.

336

Drury W. Cooper and Thomas J. Byrne, both of New York City, and Henry M. Huxley, of Chicago, Ill., for plaintiff-appellee.

Russell Wiles, Bernard A. Schroeder, George A. Chritton, and Chritton, Wiles, Davies, Hirschl & Dawson, all of Chicago, Ill., for defendant-appellant.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

SPARKS, Circuit Judge.

The original complaint charged defendant with infringement of United States Patent to Mead, No. 1,736,544, issued November 19, 1929, on an application filed August 24, 1927. Subsequently, by supplemental complaint, plaintiff charged defendant with infringement of United States Patents to Johnson, No. 2,129,374, and to Cohen, No. 2,140,311, both of which were issued after the filing of the original complaint, on applications filed before that time on the respective dates of August 17, 1934, and July 23, 1932. Plaintiff does not manufacture or sell cigar lighters. It is in form a patent holding company for Casco Products Corporation, of Bridgeport, Connecticut, which has an irrevocable, royalty-free license and pays plaintiff's expenses. The defenses were invalidity and non-infringement.

The District Court found that claims 2, 3 and 11 of the Mead patent were valid and infringed, and that all of the claims in issue of the other two patents were invalid for lack of invention. The defendant, in cause No. 7103, appeals from the ruling on the Mead patent; and the plaintiff, in cause No. 7104, appeals from the ruling on the Johnson and Cohen patents. The cases were consolidated in this court for argument.

The Mead patent relates to cigar lighters, or devices of a similar nature, wherein a member is arranged to be electrically heated to incandescence to be used for lighting cigars and the like. Its object is to produce a simple device which is more efficient and cheaper than those theretofore used.

It comprises a base unit and a plug removably mounted in it. The plug carries a resistance coil that may be heated to incandescence to serve as a lighting medium. The base has a socket for receiving the plug, both movable on the base between a position where the coil is energized and a position where the coil is de-energized. Normally the socket and plug are held in position where no current will flow through the heating coil. When the coil is to be heated, the plug and socket are moved to the energizing position, where they are held locked until the heating coil has reached the desired temperature. A thermostatic element, responsive to the tempera-

ture condition of the heating coil, releases the engagement of the socket and plug in locked position, whereupon they return to the original position so that the plug may be removed for use in lighting.

Illustrative of the disclosure is a lighter of the type suitable for use on dashboards for automobiles. It comprises a metallic supporting plate, which carries a base assembly of the lighter, comprising a fiber or other insulating plate adapted to be secured to the supporting plate.

Mounted in the center of the fiber plate is a socket carrier, which has a central hole, and on one side of which is an upstanding bracket.

Mounted on the socket carrier is a socket in the form of a cup-shaped metallic cylinder, having a closed bottom with a central opening through which it is rotatably secured above the carrier by means of a pivot screw. One side of the socket cylinder has a perforation and the opposite side has a slot. The bottom of the socket has also a circular slot into which an upstanding lug of the socket carrier projects to limit the rotary movement of the socket around the pivot screw. A spiral biasing spring, having its inner end anchored in the head of the screw, and its outer end secured to the wall of the socket, tends to hold the socket in one end position as determined by the upstanding lug acting as a stop, this position corresponding to the off position of the lighter. The lower part of the socket surrounding the spiral biasing spring is somewhat bulged in order to accommodate the spring.

The upstanding bracket of the socket carrier was insulatingly mounted thereon a latch and release element, comprising a catch spring, having a folded end portion adapted to act as a catch when held in a bent-away position by means of a thermostatic element, such as a bimetallic strip. The catch spring and the bimetallic strip of the spring are suitably mounted on a supporting plate which is insulatingly secured to the bracket.

The several parts are readily assembled into a complete unit by screwing the latch unit to the upright part of the socket carrier, placing the pivot screw in the base opening of the socket, screwing it over the socket carrier on the fiber plate, and placing the spiral spring within the lower bulged portion of the socket. The base has two supply connections, or conductors, leading from a source of electric energy to a terminal extension of the socket carrier, and to the latch plate, respectively.

Within the socket there is removably mounted a plug unit completely assembled. It comprises a knob of insulating material, having a molded-in central square brass pin, provided with a longitudinal tapped perforation. On this knob is mounted a cylindrical metallic shell which is open at one end and closed at the other, having at the closed end a square hole fitting over the square pin of the knob. On one side of the side wall of this shell there is a perforation corresponding to the perforation in the socket, and on the opposite side of the shell there is an embossed protuberance adapted to fit into the slot of the socket and engage it, so that upon turning the shell by the knob, the socket will be rotated on the pivot screw.

Within the brass shell there is mounted a core which fits the shell and has a longitudinal perforation, the lower portion of which fits over the square end of the knob pin. Extending transversely through the core, at right angles to the longitudinal perforation, is a second perforation in which is mounted a latch pin, one end of which is rounded for smooth engagement with the spring latch. Fitting into the open end of the shell, in front of the core, is a heating unit comprising a flat cup-shaped metallic container, having mounted therein an insulated spirally-wound heating coil, the outer end of which is connected to the walls of the cup, and the inner end of which is secured to a central screw. The coil and the screw are insulated from the cup by means of mica washers so that, by establishing circuit connections to the walls of the cup and to the screw, current may be sent through the coil. The coil with the screw is inserted through the perforation in the bottom of the cup and held in place with the mica washers by a nut.

The heating unit screw is arranged to be threaded into a tapped perforation in the latch pin. To assemble the plug the core is inserted in the brass shell and the two are secured over the square pin in the knob by a screw. The latch pin is inserted through the perforation of the shell into the perforation of the core, and the heating unit screw is screwed in place, thereby locking the latch pin in its position. Thus the latch pin will act as a terminal connection to the inner end of the heating coil while the shell will act as a terminal connection to the outer end of the coil. The

walls of the cup of the heating unit are preferably tapered so as to wedge tightly on the inside of the shell when screwed down.

When the plug is inserted in the socket, the pin and the embossed protuberance slide into the slots of the socket, the protuberance serving to drive and rotate the socket when the knob is turned. The width of the slot of the shell is such that the latch pin makes no contacting connection with the socket walls.

Thus, with the plug inserted in the socket the rounded terminal end of the latch pin will project freely in space and no current will be passing through the heating coil.

In order to operate the lighter, the plug is turned to the on position. This brings the projecting end of the latch pin into engagement with the detent of the catch spring which is held pressed outwardly by the thermostatic element which is in the form of a bimetallic strip. The socket with the plug is held in this position by the detent against the tension of the spiral biasing spring, and in this position a circuit is established from the supply wire through the socket carrier terminal, socket, shell, heating cup, through the heating coil to the screw, thence through the spring and bimetallic strip to the other supply wire. The thermostatic element is so arranged as to hold the latch pin in engagement with the pin until the coil is heated to incandescence. As the heating coil warms and becomes incandescent, the simultaneously heated bimetallic strip becomes deflected so that the end acting upon the detent turns inwardly towards the supporting plate thereby releasing the latch pin, thus causing the biasing spring to throw the socket with the plug to the off position, and the plug is ready for removal for lighting purposes.

Claims 2, 3 and 11 were the only ones relied upon.[1]

The accused device consists of a plug and socket member. The plug telescopes straight into the socket in any angular position, that is to say, there are no pin and slots to be aligned between the plug and socket. Two electrical terminals are provided about the socket, so that whenever the cordless plug member is in the socket two electrical contacts on the plug are in electrical engagement therewith.

The plug member has a metal body equipped on its inner end with a cup containing a heating coil which is brought to incandescence when the electrical circuit is closed by a straight push on the knob of the push button switch mounted in the plug. The cup forms one contact which normally engages one socket contact, and the metal body, electrically insulated from the cup, forms the other contact and normally engages the companion socket contact. The connections between the plug and socket contacts are not disturbed in any way when the push button is pushed in or out to control the circuit.

The internal switch in the plug member of the accused device is provided with a claw-like thermostat which holds the switch for a sufficient time for the coil to heat, after the push button is thrust inwardly. This push button also serves as a knob for handling the plug. The thermostat is concealed in the plug body and is mounted on one of the switch contacts near the heating coil so as to grip the movable switch contact carried by the push button. As the thermostat warms, it expands and finally permits a spring in the

[1] "2. In a device of the class described, a removable heating member having an electrical heating unit, a socket for receiving and holding said heating member, electrical current supply terminals, means for moving said heating member to a position for establishing an energizing circuit to said heating unit, and means responsive to the temperature of said heating unit for interrupting said energizing circuit.

"3. In a lighting device for cigars and the like, a removable heating member having an electric heater, a support for receiving and holding said heating member, current supply terminals on said support, said heating member being movable on said support to a position where said

heating unit is energized from said terminals and means responsive to the temperature of said heating unit for controlling the heating thereof."

"11. In an electric lighter of the class described, a base member, a heater member movably mounted on said base member, an electric heater on said heater member, electrical supply terminals on said base member, said heater member being movable between an energized position where a circuit is established from said terminals to said heater, and an off position where said circuit is interrupted, and automatic means for withdrawing said heater member from the on position to the off position upon heating of said heater."

plug to push the movable switch contact back into open circuit position.

Everything disclosed by defendant's device, except the thermostat, was taught by the prior art patent to Zecchini, No. 1,-437,701. It disclosed a non-automatic wireless lighter in which the electric circuit was closed, after the insertion of the plug in the socket, by an inward thrust of the push button in the outward end of the plug. The absence of a thermostatic control of the switch required the user to continue the manual pressure on the push button, thus holding the circuit closed, until in his judgment the lighting coil in the end of the plug was sufficiently heated to light the cigar or the like, at which time the entire plug was withdrawn for that purpose. If not withdrawn, however, the electric connection was opened whenever pressure on the push button was released.

Defendant's device and Zecchini both differ from Mead in this, that in the former the plug telescopes straight into the socket in any angular position, and there are no pin and slots to be aligned between the plug and socket. In the latter the reverse is true. Defendant's device further differs from Mead in the following respects: In the former, the thermostat is positioned in the plug between the push button and the heating unit, very near the latter. The socket is fixed in its position and cannot move. When the plug is inserted in the socket both remain stationary. The switch is closed by pressing the push button on the outer end of the plug. This causes a concealed screw head, or the like, on the inner end of the push button, to snap into the claw-like thermostat, which holds the switch closed until the heat from the coil on the innermost end of the plug causes the thermostat claws to expand, thereby releasing the push button, and restoring it to its normal position.

Mead's thermostat is outside both the plug and the socket. A latch pin extends laterally and rigidly through the plug, and when the plug is inserted in the socket, the protruding ends of the pin engage slots in the socket, without which engagement the plug would not enter. It is not necessary that one end of the pin should extend more than slightly, if at all, beyond the periphery of the socket for, as we understand it, the only function of this end is to engage the plug with the socket, so that any rotary movement of the plug will produce a like movement of the socket. The other end of the pin, however, extends a greater distance beyond the periphery of the socket, for this end, upon rotation, latches with the spring which engages the thermostat, thereby closing the circuit and holding it closed until the heat from the lighting coil on the bottom of the plug causes the latch pin to be released. When the plug is inserted, its protruding handle is rotated to the right against the tension of a spring in the bottom of the socket. This in turn rotates both the plug and the socket, and causes the latch pin to engage the spring adjacent the thermostat, thus connecting the circuit. When the heating unit becomes incandescent the latch pin is released, and it with the plug and socket rotate to the left to their original position.

It is most difficult to determine precisely the point or points of novelty upon which plaintiff bases its claim of validity. The patentee said that his only expressed object was to produce a cigar lighter, or the like, which would be extremely simple, cheap in manufacture, and more efficient than prior devices of that character. By way of results he disclosed nothing more than the prior art had disclosed, except possibly those results which were produced by the co-operation of the thermostat, and yet plaintiff insists that Mead's invention is not the mere use of a thermostatic switch with a wireless cigar lighter. Assuming this to be true, it is obvious that the novelty, if any, must lie either in the construction of the device, or/and the method and means of its operation. But again, plaintiff insists that Mead produced the first automatic wireless cigar lighter known in the art in which the members are brought into proper connection and held automatically until automatically released, by "the essential feature of * * (Mead's) combination, being the spring and the thermostatic device." If this be true, it is clear that it was due to the automatic feature, which in turn was due to the thermostat, and Mead was entitled to the patent on the mere use of a thermostat switch with a wireless cigar lighter, providing, of course, he was not anticipated by art in the same or analogous fields. Since plaintiff does not contend for, but denies, such broad construction, it amounts to a concession, at least, that Mead does not anticipate every automatic wireless cigar lighter wherein a thermostat is used. Both Mead and defendant were privileged to use a wireless cigar lighter, to close an

electric circuit, and to keep it closed and reopen it at a given time by means of the thermostats which they used. All of these elements and their uses, separately, were quite old, and unless appellant's device has clearly violated the disclosures of the patent there can be no infringement. Otherwise the result might prevent the use of any thermostat with any wireless cigar lighter, which plaintiff admits would not be authorized by the claims.

Plaintiff insists, however, that in every respect defendant has used the precise methods, means and principles which are found in the patent. The argument in support of this contention is centered about the means by which the circuit is connected and disconnected, and is not and cannot be based on the mere fact that the circuit is connected and disconnected. It is true that defendant's push button in the outer end of the plug is an equivalent of Mead's rotating knob, if we consider the ultimate result alone, for each ultimately causes the circuit to close, and both are manually operated, as are all switches where the closing is not thermostatically operable. Both means were quite old in the art, and there was no novelty in the mere use of Mead's manual rotary pressure to connect the circuit. If there is novelty in the disclosures, it must relate to the means which operate as a result of the rotary pressure, aside from the ultimate result of closing the switch, and we think the claims must be construed rather narrowly in order to avoid the prior art, if possible.

Plaintiff stresses as new the pin which engages the latch controlled by the thermostat. It passes through the core of the plug and also through the socket walls so that when the knob is rotated to close the switch, it rotates not only the entire plug, including the heating unit and the entire socket, but also the pin which is attached to them, until the protruding end of the pin engages the latch controlled by the thermostat, both of which are located outside the socket on a bracket extending from the bottom of the socket carrier. Defendant's device has neither latch pin nor bracket, and its catch spring and thermostat are wholly within the plug. Its socket and plug, including the heating unit, remain stationary after the plug is inserted, except that part of the plug referred to as the push button and its attachments, together with the spring which controls them. They are not rotated but are pushed longitudinally of the plug, against the tension of the coil spring, until the end of the push button shaft engages the claw-like thermostat which is positioned adjacent the heating unit.

It is quite obvious that this construction is radically different from that of Mead, but plaintiff insists that the claims read upon the accused device, and that the principle disclosed by each is the same. We think the claims do not read upon the accused device in that defendant's heating member after insertion is not movable on a support to a position where the heating unit is energized. Plaintiff stresses the distinction between the heating member and the heating unit. The first is the plug with all that is attached to it before insertion, which includes the heating coil and the latch pin. The heating unit is comprised of the heating coil and the metal cap and screw which hold it in position on the inner end of the plug. It argues, therefore, that any movement of any part of the heating member after insertion, such as a thrust of the push button, is in fact a movement of the heating members within the meaning of the claims. We cannot accept this interpretation, for we think it would preclude the use of any automatic wireless cigar lighter, operable by a thermostat, without infringement.

Again, Mead differs from the accused device with respect to his spring which rotates the socket, plug and catch pin back to their normal positions when the pin is released from the thermostatic spring. As shown by the physical exhibit, it is a very thin band, coil spring, upon which the heating unit rests when the plug is inserted. The center end of this spring is fastened to a threaded screw bolt, which extends through the center of the socket bottom and is firmly secured to and through the base board by means of a nut, thus permitting the socket to rotate upon the bolt. The outer end of the spring is connected to the socket wall, so that when the knob is rotated to connect the circuit, the band socket spring is thereby tightened, thus causing a reverse pull upon the latch pin. As the heating unit becomes heated, it not only tends to reduce the hold of the thermostatic spring upon the latch pin, but the heat also expands the socket spring, thereby increasing its tension, so that the latch pin is released, as claimed by Mead, by the effect of the heat upon either spring or both.

Defendant's device has but one spring. It is a coil of round metal, positioned longitudinally of and around the shaft of the push button, just as far from the heating unit as the device will permit. Theoretically we know that any degree of heat causes a relative expansion, and we suppose that the tension of appellant's spring is theoretically increased somewhat by the heat from the heat unit. However, the expansion must be extremely slight, and we are not convinced from the evidence that the amount is substantial, or that the successful working of the accused device is in any manner aided by that feature. If defendant had otherwise intended or desired, it could have placed its spring much nearer the heating unit, without trouble or expense, and procured the benefit, if any. We think there is no infringement.

It is obvious that there is nothing found in defendant's device which is not found in Zecchini, and in Copeland No. 1,844,206, and we think the same may be said with respect to Mead. Plaintiff, however, contends that Copeland's device is not an automatic wireless cigar lighter. With this we cannot agree. Of course, all cigar lighters have wires whether they be automatic or what is termed wireless, that is to say they have those wires which conduct electricity. We suppose, however, that a wireless cigar lighter is commonly understood to mean one in which all connection of the plug to the device is severed when the plug is withdrawn from the socket. But even so, we think Copeland is an automatic wireless cigar lighter. It is not only wireless in the popular sense, but it is plugless. It provides for the insertion of a cigar in the socket instead of a plug, and the cigar is lighted before it is withdrawn from the socket. The cigar is inserted in a tubular guide and thrust inwardly until the circuit is connected, at which time the end of the cigar rests upon the heating unit, which heating unit remains in the socket. The connection is held until the heating unit becomes incandescent, and the

cigar is lighted, at which time the heat from the heating unit operates the thermostat to release the cigar and its guide from the heating unit and they return to their normal position.

Before the Mead disclosure wireless cigar lighters were old, wherein the heating unit was on the end of the plug and the plug was removed for the purpose of lighting the cigar. All that Mead did was to cause the thermostat to operate on the plug in effect the same as Copeland permitted it to operate on the cigar. We do not feel justified in holding that this amounted to invention, in view of the fact that wireless plugs without the thermostat had been used so long, and in view of the further fact that the same principle of thermostatically disconnecting the circuit had been used in the manufacture and use of electric irons, and the like. We think the fields are quite analogous, and since all of Mead's elements were quite old in both fields and he made no use of any new principle, we think his disclosures amounted to nothing more than mechanical skill, and we think the claims herein relied upon are invalid.

### Cohen Patent No. 2,140,311.

It is unnecessary to describe this patent in detail. In general external appearance it resembles all other devices of that character. It differs from Mead in that Cohen secures his thermostat to the bottom of the socket, and when the plug is entirely inserted in the socket, the arms of the thermostat engage the end of the collar button stud which is attached to a spring-pressed slide in the socket. He also disclosed the alternative of placing the thermostat on the spring-pressed slide so that it may engage a collar button stud which is fastened to the bottom of the socket.

Cohen relies on claims 3, and 14 to 26 inclusive. He considers 3, 15 and 24 as typical,[2] and contends that they disclose three characteristic features: (1) An au-

---

[2] "3. In an electric cigar lighter, the combination of a base member; a socket on the base member; a plug removably mounted in the socket and longitudinally movable in said socket to a shallow inoperative position and into a deep operative position; a heating coil on said removable plug; means adapted to move the removable plug in the socket from the deep operative position to the shallow inoperative position preparatory to re-

move and use; and thermal responsive means in axial alignment with the plug for restraining said last-named means until the heating coil reaches a predetermined temperature."

"15. A cigar lighter having two parts one constituting a holding device and the other constituting an igniting unit removably supported by the holding device and having a heating element thereon, one of said parts having a pair of rela-

tomatic wireless cigar lighter in which the circuit is closed by longitudinal movement of the plug in distinction to the rotary movement of Mead, which result is attained by disposing a thermostat in coaxial alignment with the plug; (2) the inclusion in either of the two main parts of the lighter, the holding device or the igniter unit, the cooperating parts of the thermostatically controlled switch. This he says makes possible a rigid interchangeability between the igniter units and the holding devices without the necessity of carefully balancing certain elements carried by one of the main parts of the cigar lighter against cooperating elements carried by the other; (3) the provision of auxiliary contact, so that if it is desired to manually close the circuit after the thermostat has opened it, this may be done by manually pushing in the igniter unit, and manually holding it.

Very little need be said in regard to the third feature. It merely means that if the user desires to get another light before the thermostat has cooled off and returned to its normal position, he may use the device as a non-automatic wireless cigar lighter by manually closing the switch, and holding it until he thinks the heating unit is sufficiently hot to light the cigar. This particular feature is the very thing which Mead and all other automatic cigar lighters sought to avoid, because it was not conducive to safe driving. A return to such unsafe practices we do not regard as an improvement in the arts and sciences. There is nothing novel or advantageous in this feature.

With respect to the first feature, we think it is obvious that defendant does not infringe the Cohen patent. It is true that the circuit is closed in each by a movement longitudinal of the plug, but as stated in our discussion of Mead, who used the rotary movement, a mere longitudinal movement of the defendant's push button in the center of his plug, after the plug has come to rest and the contacts are all made, is not the equivalent of moving the entire plug in order to close the circuit.

With respect to the second feature, it is sufficient to say that it never appeared in the original specifications and drawings of Cohen, No. 2,140,311. They never intimated the mounting of the thermostatic switch in the plug member, as practiced by the defendant, until long later by amendment under circumstances presently to be mentioned.

Even though defendant's elements might appear to be equivalents of Cohen, there are some circumstances disclosed by this record which convince us that it is not a mere question of equivalents. Defendant developed his device in September, 1933, and it was proven successful by a test on October 16, 1933. True, Cohen had filed his application on July 23, 1932, but his patent was not issued until December 13, 1938. In May or June, 1938, defendant was producing and selling a considerable number of its devices to many different automobile concerns. Shortly thereafter Cohen saw and studied it, and afterwards in September, 1938, while this suit was pending, he added to his pending applica-

tively movable members; means for normally urging the members apart; cooperating circuit-closing means mutually carried by the members; manually operable means for moving said members toward one another into position to close a circuit through the heating element, said circuit-closing means including heat-responsive means in heat-receiving relation with the heating element for opening the circuit when the heating element has attained its desired usable heat; and auxiliary contact means to close said circuit when the heat-responsive means is in open-circuit position and said parts are held together manually."

"24. A cigar lighter having two completely separable parts, one being a holder and the other an igniting unit supported by the holder but removable therefrom for use and carrying a heating element; means for feeding energizing current to the heating element including cooperating contacts on the holder and igniting unit; a switch having relatively movable contacts, manually operated means for closing said switch; and thermostatically controlled means associated with said switch and in heat-receiving relation with the heating element for causing the switch to be opened when the heating element is ready for use and to remain open until the next operation of said manually operated means, said switch and thermostatically controlled means being entirely carried by solely one and the same of the said two parts of the cigar lighter, so as to remain in predetermined operative relation relative to each other in a single operative assembly irrespective of the interchange of said igniting unit or holding device with other like igniting units or holding devices."

tion claims 14 to 26 inclusive, as they now appear. On November 19, 1938, while the present suit was pending Cohen substituted a new preamble to his specification, in which he gave the purposes and objects of the invention, and for the first time recited that his thermostatic switch could be used in either the plug or the socket parts of the lighter, and that it would no longer be necessary to match the parts, and pointed out that the parts were in co-axial alignment.

This addition of a new preamble and claims seems to have been an effort to meet the differences, if any, between Mead and the accused device, and such practice seems not to be countenanced by either the statutes or the decisions. See Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053; Hobbs v. Beach, 180 U.S. 383, 21 S.Ct. 409, 45 L.Ed. 586; General Electric Co. v. Sangamo Electric Co., 7 Cir., 174 F. 246. For this reason we think the District Court did not err in holding the claims of the Cohen patent invalid. We are also of opinion that this patent is invalid for lack of novelty.

### Johnson Patent No. 2,129,374.

Claims 1 and 4 of this patent are considered by plaintiff as typical.[3] Plaintiff says that the gist of these two claims is the provision in a cigar lighter having the usual holding device and igniter unit, of a single readily removable, unitary structure, carrying both the igniter coil and the bimetallic fingers in heat responsive relation thereto, the bimetallic fingers having latch portions adapted to hold the igniter unit in closed circuit position until the igniter coil reaches the proper temperature for use.

There are no new elements disclosed here, and the patent differs from Cohen patent No. 2,117,232 in that Johnson places the exposed thermostat on the inner end of the plug, while in Cohen the exposed

thermostat is fastened in the socket. What we have said with respect to the Cohen patent in suit is quite applicable to Johnson. Furthermore, the date of Johnson's application, which is his effective date, was long subsequent to defendant's disclosure. These claims are invalid for the same reasons assigned by us in the ruling on the Cohen patent in suit.

We think the District Court erred in sustaining the Mead patent and in ruling that its claims were infringed by the defendant. In this respect the decree is reversed and the cause is remanded. As to the Cohen and Johnson patents, the decree is affirmed.

---

3 "1. In a cigar-lighter, a base member; an igniting unit normally supported on but completely removable from the base member for use; a heating element mounted on the igniting unit for convenient removal and replacement; a circuit for conducting current to said heating element; manually operable means for closing said circuit to the heating element; and means carried by the removable heating element in permanent association therewith and responsive to the temperature of the heating element for opening said circuit."

"4. In a heating element for cigar lighters having an igniting unit of the type removable from a holding device for use; a manually movable support; a resistance coil mounted on the support; and a bimetallic strip secured to and carried by the support permanently in heat-conducting relation with the resistance coil and having a latch portion formed on the end thereof."