146

## AUTOMATIC DEVICES CORPORATION v. CUNO ENGINEERING CORPORATION.

### Civ. A. No. 97.

District Court, D. Connecticut.

June 7, 1940.

Cooper, Kerr & Dunham, of New York City, and James T. Kline, and George F. Smyth, both of Bridgeport, Conn., for plaintiff.

Charles M. Lyman and Clarence W. Bronson, both of New Haven, Conn., for defendant.

HINCKS, District Judge.

1. Plaintiff is a corporation of Connecticut. It is a patent holding company and does not manufacture or sell cigar lighters. Defendant is a Connecticut Corporation located in Meriden, Connecticut, where it has long been engaged in the manufacture and sale of cigar lighters. The expense of this action is being borne by plaintiff's licensee, Casco Products Corporation, also a Connecticut corporation.

2. This is an action under the patent laws for infringement of claims 1, 2, 3 and 11 of the Mead patent 1,736,544 filed August 24, 1927, dated November 19, 1929 for Cigar Lighter, transferred by mesne assignments to plaintiff February 6, 1936. Infringement is also urged of claims 3 and 20 of the Cohen patent 2,140,311 dated December 13, 1938 for Cigar Lighter, filed January 2, 1937 as an alleged division of Cohen patent 2,117,703 filed July 23, 1932, and issued to plaintiff. Also infringement is urged of claims 1, 2, 10, 16 and 18 of the Cohen patent 2,117,232 dated May 10, 1938 for Cigar Lighter, filed March 29, 1933 and issued to plaintiff.

3. The defendant's device, accused of infringement, described with the aid of numerical references drawn from Exhibits 1A to 1C, consists of two main parts, viz., socket and plug.

(a) The socket is a subcombination comprising a metallic cylinder 10 adapted to be inserted through the instrument panel 14 of an automobile. From the rear end of the socket protrudes a stud 11 carrying a rod 12 which connects the inside and outside of the socket. To the outer end of the rod 12 is attached a current supply wire. The inner end of said rod carries three bimetallic fingers 16 which, by their cooperation with the flange 35 of the "movable" plug hereinafter described, constitute the latch of the device also serving as live contacts. In the base of the socket are three rigid, spaced, base contact abutments 17, against which the cup 28 of the "fixed" plug rests when the movable plug is in both closed-circuit and open-circuit positions.

(b) Associated with the socket, as above described, are other parts including a clamping member 15 which in cooperation with a flange on the outer end of the socket serves to clamp the socket to the panel of the automobile. But except for this clamping function, these associated parts of the socket are not in cooperative relationship with the socket, or indeed with the plug.

(c) The plug consists of two relatively movable subcombinations, one of which (hereinafter referred to as the "fixed" plug) is carried on the sleeve 18, and the other of which (hereinafter referred to as the "movable" plug) is carried on sleeve 19. The sleeve 18 comprises a tube of insulating material which carries at its inner end (inner with respect to the socket member) a metal sleeve 23 having spoke-like arms 24 joined at the center and carrying a cylindrical block 25. The inner end of the block 25 is engaged by a screw 26 which carries the heating element comprised of the igniter coil 27. The inner convolution of the igniter coil is received in a slot in the head of the screw 26 and the outer convolution of the igniter coil is connected to the cup 28 which surrounds the igniter coil. When the plug is inserted in the socket, the insulating tube 18 slides along and is guided by the inner wall 10 of the socket

until the igniter cup 28 abuts against the base contacts 17 of the socket. This is the carrying or open-circuit position of the fixed plug; also its operative or closed-circuit position.

(d) The movable plug consists of the metal sleeve 19 which is mounted slidably in the interior of the sleeve 23. The sleeve 19 has at its outer edge (outer with respect to the socket) an end wall 20 carrying a stud 21 to which is secured an insulating disc and screw 21(a) on which the knob 22 is threaded. The sleeve 19 at its inner end is shaped into a contact flange 35 adapted to engage and be retained by the bimetallic latch fingers 16 of the socket. With the entire plug in carrying or open-circuit position, the movable plug can be manually pushed inward by pressure on the knob 22 until the flange 35 of the sleeve 19 is engaged by the bimetallic fingers 16 of the socket, thus closing the circuit.

(e) There is a coil spring 34 interposed between the spoke-like arms 24 of the sleeve 23 in the fixed plug and the end plate 20 of the sleeve 19 in the movable plug. The movement of the movable plug from carrying to operative position is accomplished against the pressure of this spring, as a result of which the contact cup 28 is held under spring pressure against the butts of the socket as long as the bimetallic fingers 16 in the socket hold the flange 35 of the fixed plug in engagement. When by convection and radiation (but not by conduction) the bimetallic fingers of the socket are spread apart after the igniter coil has been heated to incandescence, the spring 34 returns the movable plug to carrying position with the circuit open, the entire plug fixed and movable being then ready for removal for application.

4. (a) Hammarstrom, 493,380 (application 1892), showed a "combined Cut-out and Lightning-arrester" by introducing into a line of electrical current a bimetallic member and latch so arranged that "a strong electric current" would expand the bimetallic part, apparently from the heat generated by the current through the bimetallic part, thus releasing the latch member and breaking the circuit. The invention was apparently primarily directed to the protection of telegraph circuits from the onslaught of a lightning bolt.

(b) Denhard, 1,143,572 (application August 31, 1910), disclosed a means for thermostatic control for electric heaters, with particular reference to electric flat-irons.

The thermostatic means disclosed contained no parts having coaxial characteristics or any peculiar adaptability to a socket or cylindrical member; nor did the disclosure include any such socket member in its combination. He did, however, disclose as current-breaking means bimetallic strips, responsive to the temperature of the working base of the flat-iron, in cooperation with a latch, which holds the device in closed-circuit position until a predetermined temperature of the iron is attained.

(c) Stahl 1,372,207 (application 1919) illustrates a construction in which the bimetallic element of a thermostatic switch functions directly as the latch, as is also the case in Hammarstrom 493,380.

(d) Morris 1,376,154 (application 1919) shows a wireless cigar lighter having as an alternative form a semi-automatic feature whereby the plug is held in the open-circuit or carrying position by a spring in the socket. To close the circuit, the entire plug is manually pressed inwardly. It is manually held in this position by the operator against the tension of the spring during the entire heating up period of the igniter coil. Whenever the operator releases the manual pressure on the plug, the spring returns the plug to its normal open-circuit position. There is no thermostatic control in the Morris patent.

(e) Zecchini, 1,437,701 (application April 15, 1921) is an example of prior art showing that a coaxial relationship between the parts was the usual arrangement in the conventional plug and socket type of lighter.

(f) Copeland, 1,844,206 (application April 18, 1927), disclosed in a lighter socket thermostatic means, consisting of parts in coaxial relationship, acting as an automatic means to break the circuit in response to the temperature of a resistance element. This resistance element did not itself serve as an igniter; rather it served to break the circuit after the lapse of time sufficient to accomplish the incandescence of the igniter and the lighting of a cigar. Copeland showed no plug; rather he contemplated that a cigar should serve as a plug; that the manual insertion of the cigar into the socket should close the circuit and thus start the lighting process.

(g) Cohen, 1,944,925 (application April 22, 1929), shows a plug and socket lighter with complete switch-mechanism in the socket. His plug was adapted automatically to break the circuit upon the release of

manual pressure on its knob. All the essential parts are in coaxial relationship with each other. Devices made under this disclosure were in use for two years prior to the two Cohen patents in suit. This patent shows no thermal control.

(h) Wolfson, 1,980,157 (application April 10, 1931), showed a plug and socket lighter, in which all essential parts were in coaxial relationship to each other, with the plug carrying a spring effective, under the arrangement disclosed, by pressure on a fixed part of the plug to push the movable part thereof carrying the heater unit into a normal carrying or open-circuit position with the heater unit out of contact with the metallic contact fingers of the socket. The contact fingers of the socket, however, lacked the function of latching and the function of unlatching in response to heat.

## Mead

### 5. Claim 1 is not infringed.

### Comment

Claim 1 covers a combination purporting to have two main subcombinations, viz., (1) a removable plug, and (2) a "base member". But the base member disclosed in the patent is not the conventional simple socket well-known in the electrical art. It is a complex combination in itself which amongst other features serves as a mounting for a movable rotating socket 41. And claim 1 definitely includes this rotating socket as one of the elements of its subcombination when it refers to "means on said base member for moving said plug to an energizing position in which said coil is energized."

It is not sensible to direct this reference, as plaintiff would have me do, to the knob on the plug. For the knob of the plug no more cooperates with the movement of the plug than the handle of a hammer with its head. Clearly the quoted reference is directed to the socket which guides the plug in its longitudinal and rotary movements.

The defendant's device does not include the complex base member disclosed by the patent. In the defendant's device the socket does not move at all (nor the fixed plug either) when the movable plug moves from carrying to closed-circuit position. The defendant has utilized a socket which performs all the useful functions which in the disclosure of the patent are accomplished by a plurality of elements including the socket 41 and its associated parts plus the base member 34 and its bracket 37 and other associated parts. As a result the defendant's device involves only a simplified cooperation between plug and socket members instead of the complex cooperation which Mead provided betwixt plug, socket and base members.

## Mead

### 6. Claim 2 is not infringed.

### Comment

This conclusion turns upon a proper construction of the claim, and I turn forthwith to that task.

Claim 2 states a combination composed of three main subcombinations. The first subcombination is the plug. The only unusual feature of Mead's plug which could possibly be considered as a contribution to a genuine invention is the rotary contact pin 75 which protrudes through a slot in the socket. The second subcombination is the socket. The only unusual feature of the socket is the fact that it is rotatably mounted upon the third combination, a base member, thereby deriving rotary movement in one direction through manual pressure on the plug and in the other direction through the force of a spring.

The third subcombination is indicated by that language of the claim which says "means responsive to the temperature of said heating unit for interrupting said heating circuit." The patent discloses as the interrupting means certain bimetallic parts 54, acting in cooperation with a spring 47 which may or may not be bimetallic. But it is not enough for the patent to specify the elementary parts. For the combination claim to have validity, the patent must also disclose how the separate parts may be given the capacity for mechanical and electrical cooperation; without this disclosure no operative device or combination has been shown.

In order to teach how his chosen parts might be brought into cooperative relationship, Mead showed his thermostatic means 57 mounted on a bracket of the base-member, which constitutes the third subcombination of the claim. There is utterly nothing in the specifications to suggest that the inventor himself knew how to work the necessary parts of the aggregate combination into two subcombinations, plug and socket; his only solution of the problem of introducing into the familiar plug-and-socket combination a thermostatic current breaker involved the use of an additional

subcombination, viz., the base-member. The specifications call for a base-member as an indispensable element; there is nothing to show that the base-member was an optional or preferred arrangement, indeed no substitute arrangement was disclosed.

It is true, of course, that claim 2, unlike claim 1, does not expressly call for a base-member. But the claim would be void for indefiniteness if its call for thermostatic means were not deemed to include the base-member on which the thermostatic means is mounted and through which alone the thermostatic means can cooperate with plug ·and socket.

Moreover, in view of the prior art in the field of manually portable electrical devices, the claims in suit to avoid invalidity must be narrowly construed. In view of such prior art as Zecchini, Hammarstrom and Denhard, Mead's success, whether attributable to genuine invention or to mechanical skill, in working out an arrangement whereby latching means subject to thermostatic control (old in themselves) might be brought into cooperation with the socket and plug parts of an electric lighter (also old in themselves) must be limited to the means used. Thus Mead's invention, if any, must be limited to the three-fold combination which was his only solution of the problem. Cf. Automatic Devices Corp. v. Sinko Tool & Mfg. Co., 7 Cir., 112 F.2d 335, 45 U.S.P.Q. 394, April 27, 1940.

Thus viewed, the accused device does not infringe. It does not use the unusual features of Mead's plug and socket members adverted to above. It does not use Mead's base-member which, as just pointed out, is impliedly a part of claim 2, if the claim has validity. It does not follow Mead's arrangement of a three-fold combination. Instead, it performs every function of Mead's disclosure by a simplified and improved arrangement of two subcombinations only, as against Mead's three. The monopoly of the patent may not be invoked thus to throttle the development of the art.

The plaintiff suggests that in the accused device there are parts associated with the socket which in effect constitute a base member equivalent to that of Mead. I cannot agree. The parts referred to (Par. 3b, supra) cooperate with the socket as a clamping means; they cooperate neither with the socket nor with the plug in the operation of the device. In Mead, however, the base member carries outside the socket a subcombination which includes latching and unlatching means; and this latching subcombination in the operation of the disclosed device is in active mechanical cooperation with the subcombination of his socket; also with the subcombination of his plug.

Nor can it properly be contended that the accused device, like Mead, utilizes a three-fold combination, the only essential difference being that the accused device has made two subcombinations of the plug (fixed and movable), whereas Mead's base member comprised two subcombinations (thermostatic control and socket). For the fixed plug of the accused device cooperates with the socket only as a holding means. In the function of operation, the fixed plug moves not at all; its mechanical relation to the socket is precisely the same when the current is open as when closed. The only active, direct cooperation which serves to make and break the current is between the movable plug and the socket. This is a simple one-way form of cooperation, as distinguished from, the complex two-way cooperation of Mead. And in utilizing this switch-like push button type of plug, the defendant has followed Zecchini rather than Mead. Cf. Automatic Devices v. Sinko Tool & Mfg. Co., supra [112 F.2d 342, 45 U.S.P.Q. 394], where it was said: "a mere longitudinal movement of the defendant's push button in the center of his plug, after the plug has come to rest and the contacts are all made, is not the equivalent of moving the entire plug in order to close the circuit."

### Mead

**7.** Claim 3 is not infringed.

### Comment

Like claim 2, this claim also does not specifically mention the base-member as an element of its claimed combination. But, like claim 2, it calls for thermostatic means which so far as the disclosure of the patent goes are a part of the base-member and can cooperate with the plug in socket only with the aid of the base member.

### Mead

**8.** Claim 11 is not infringed.

### Comment

This claim resembles claim 1 rather than claims 2 and 3 in that it expressly calls for three subcombinations; the base-member as well as the plug and socket members are

specifically incorporated into the claimed combination.

The accused device, as we have seen, calls for a simplified structure in which all the cooperative parts are compressed into plug and socket members, thus dispensing with the base-member as a cooperating part essential to the entire combination.

## Cohen No. 2,140,311

9. Claim 3 is invalid for lack of patentable invention.

### Comment

At first glance, claim 3 would seem to follow Mead's disclosure in calling for a "base member" as a third subcombination in addition to the plug and socket. But the specifications make it plain that the base member called for by claim 1 is not a part in mechanical cooperation with the socket member; rather it is merely a flange on the end of the socket, not independently in mechanical cooperation with the socket or other parts.

It results that the validity of this claim depends, not upon the introduction of a new subcombination with a new function into cooperation with conventional plug and socket combinations, as in the Mead claims discussed above, but rather upon the expansion of the conventional plug and socket members well-known to the prior art to include specified thermostatic control.

I have been shown no complete counterpart of Cohen's disclosure in the prior art, but enough of the prior art has been shown to convince me that claim 3 lacks patentable invention.

The plaintiff says the gist of the invention here claimed is "the disposition of the bimetallic fingers within the socket in coaxial alignment with the plug".

This contention closely resembles that advanced by the plaintiff with respect to the first Meuer patent litigated in Cutler-Hammer, Inc., v. Carling Tool & Machine Co., D.C., 3 F.Supp. 150, 153. I there held that a coplanar relationship between the parts of an electric switch whereby the inventor obtained a minimum "dimension axially of its rotary element" was a matter of design rather than invention. This holding was upheld on appeal. 2 Cir., 63 F.2d 998. So here I must hold that it was not beyond the field of skill in design for Cohen to work the latching and unlatching elements of Mead into plug and socket where more compactly disposed in coaxial relationship they would still perform the same function.

Moreover, as appears in Paragraph 4 above, Copeland disclosed thermostatic means in a socket, the thermostatic parts being coaxial with the socket. Claim 3, to be sure, calls for thermostatic means responsive to the temperature of the heating coil, and Copeland's thermostatic means were responsive, not directly to the heating coil, but rather to the heat of a resistance element operating upon a bimetallic bar or circuit-breaker. But Denhard, long before, had disclosed a bimetallic circuit-breaker which was responsive to the temperature of the working surface of his device. And it required no invention for Cohen to make his bimetallic members responsive to the temperature of the working surface of his device, which happened to be the heating coil. And of course it required no invention, in view of the non-automatic prior art, for Cohen to put his heating coil or "working surface" on the inner end of a plug removably mounted in the socket.

Claim 3 calls for a thermostatic means which shall not only cooperate in the circuit breaking function, but shall also function as a latching means to hold the combination in closed-circuit position until the required heat has accumulated. Denhard showed a latching means in cooperation with circuit-breaking means. Also Mead.

It might perhaps be urged that to sustain its validity claim 3 should be narrowly construed so as to call for a combination which included thermostatic means consisting of bimetallic parts which themselves served both to latch and through their heat-responsive qualities to unlatch. But Hammarstrom showed broadly this twofold function of bimetal, and I must hold that it involved no invention over Mead to work such a feature into a plug and socket lighter. For when Mead showed a latch 52 and 53, held in latching position (Fig. 14) by a bimetal spring 54 (see Fig. 16), surely it involved no invention with the aid of Hammarstrom and Stahl to substitute bimetal for the actual latching piece 53. And that is the essence of the Cohen claim now under consideration.

There is, I think, no contention that features of claim 3, other than those discussed above, involved invention.

10. Claim 20 is void for lack of patentable invention.

## Comment

Plaintiff says: "The gist of this claim is the relative movement of contact carrying members in one of the two main parts of the cigar lighter (the holding device or the igniter unit) as a result of which the circuit may be manually closed and then automatically opened by the joint action of the returning spring and bimetallic latch fingers engaging one of the contacts of the relatively movable members (and coaxial therewith and with the igniter coil) when the bimetallic fingers are heated by the heat produced by the igniter coil carried by the plug."

Certainly the relative movement of contact carrying members in one of the two main parts of the lighter involved no invention over Cohen, 1,944,925. In other respects, the claim shows no more patentable invention than claim 3. Altogether it discloses only a rearrangement of old parts within the range of mechanical skill. Cf. Automatic Devices v. Sinko Tool & Mfg. Co., supra.

## Cohen No. 2,117,232

■ 11. Claim 1 is invalid for lack of patentable invention.

The plaintiff says: "The gist of this claim is the latching in of the movable part of the igniting unit in deep operative position and so forming the latch means that the tension of the withdrawing spring serves to maintain the contacts in good electrical engagement."

As to this, I cannot perceive that Cohen showed patentable invention over Mead who used spring pressure to maintain a steady electrical contact between a pin and latch member. All Cohen has done in this respect has been to translate Mead's rotary movement to a longitudinal movement. Nor did it involve invention, in view of Hammarstrom and Mead, to substitute for the contact fingers of Wolfson, 1,980,157, a bimetallic latch.

12. Claims 2 and 16 are invalid for lack of patentable invention.

## Comment

These claims are summarized by the plaintiff thus: "These claims are similar to claim 1, but further provide that the detent fingers are thermally responsive."

As to this, as my comment under Paragraph 9 above indicates, the use of bimetal for the twofold function of latching by a spring lock and unlatching through the action of heat on bimetal involved no patentable invention over Hammarstrom and Mead, both of whom also showed a latch which served also as a contact member.

13. Claims 10 and 18 are invalid for lack of patentable invention.

## Comment

The plaintiff's summary of these claims is as follows: "The gist of these claims is the provision of the combined contact and catch made of bimetal and adapted to engage and hold the circuit closing contact of the igniter unit, and the location of it in close proximity to the igniter coil so that it quickly responds to the heat of the latter. This is precisely what is found in defendant's device."

Thus viewed, the claim states no more than a rearrangement of claim 2 whereby the bimetallic latch is specifically located in close proximity to the heater element. Surely this additional feature was a matter of design rather than invention.

## General Comment

Undoubtedly the inventor who first devised the use of bimetal as an automatic circuit-breaker in electrical devices deserved well of the human race. The record before me suggests that Hammarstrom was perhaps that man; certainly neither Mead nor Cohen.

I have little doubt that the inventor who first succeeded in applying a bimetallic circuit breaker to a portable electrical heating device made the contribution of a true inventor to society. Perhaps on this record Denhard was the man.

But after the bimetallic circuit breaker had been introduced into a variety of electrical appliances such as flat-irons, coffee pots, etc., and after the electric cigar lighter had progressed through the reel stage to the wireless type of plug and socket device and the wireless type had progressed from the open face to the inverted face type, and the inverted face type had acquired semi-automatic features which held the plug in open-circuit position in the absence of manual pressure, the room for future invention in this class of electric lighter was strictly limited. I have serious doubt whether Mead transcended the realm of design; whether in essence he did more than produce a new design for old parts having familiar functions, arranging for the cooperation of the several parts by

means thoroughly familiar to one skilled in the general art of portable electrical appliances. But in any event, it is clear to me that if Mead's disclosure involved invention the only inherent invention was confined to the correlative arrangement of the numerous parts which he used. Against the background of the prior art, his arrangement was not entitled to a broad range of equivalents. And the defendant has used a simplified and improved arrangement, dispensing with some of the parts which Mead found necessary.

As against the two Cohen patents in suit, Mead and Copeland constitute prior art. Definitely Cohen was not the first to incorporate the automatic feature of bi-metal heat control into an operative electric cigar lighter. Altogether it appears to me that Cohen's achievement, skillful though it was, at least with respect to the claims in suit fell short of patentable invention.

14. The defendant is entitled to a decree dismissing the complaint, with costs, and may submit such a decree for entry.