## AUTOGRAPHIC REGISTER CO. v. UARCO, Inc.

### Civ. A. No. 48 C 114.

United States District Court
N. D. Illinois, E. D.
July 13, 1949.

Cooper, Byrne, Dunham, Keith & Dearborn, New York City, for the plaintiff.

Chritton, Schroeder, Merriam & Hofgren, Chicago, Ill., for the defendant.

SHAW, District Judge.

The original complaint in this case was filed January 27, 1948, and charges the defendant with infringement of Letters Patent No. 2,258,573, issued to Arthur A. Johnson and assigned to the plaintiff, and Letters Patent No. 2,082,730, issued to Carl W. Brenn and likewise assigned to the plaintiff. The complaint is in the usual form, with customary prayers for relief.

On February 16, 1948 the defendant filed a motion for bill of particulars, and thereafter, on March 1, 1948, what was designated as a bill of particulars was filed, and on the same date there was filed an amended complaint adding two more patents des-

ignated as Nos. 2,159,500 and 2,212,174, issued to Brenn and both assigned to the plaintiff. The so-called bill of particulars above referred to is in legal effect no bill of particulars at all, because it refers to 26 claims in the Johnson patent, 10 of which are designated as typical; to 9 claims in one of the Brenn patents, of which 4 are designated as typical; to 2 claims in another Brenn patent, and to 2 claims in another Brenn patent. It specifies 3 claims in the Johnson patent which it claims are infringed.

Defendant's answer was filed April 20, 1948, and is in the usual form. It lists 13 prior art patents as against the validity of No. 2,082,730; 22 Patents as prior art against No. 2,258,573, 15 interferences as against the same patent, as well as 5 prior patents; as to Patent No. 2,159,500, 10 prior art patents are cited; as against No. 2,212,174,9 prior patents and several interferences are cited.

As to each of the patents, it is alleged affirmatively that it is insufficiently described. It is further affirmatively alleged as a defense that the plaintiff is estopped to enforce any claim or demand in connection with any of those patents because of undue and willful delay in the prosecution in the Patent Office. It is further alleged by way of affirmative defense that by various license agreements the plaintiff has unlawfully attempted to use those patents to obtain a monopoly on materials not patented and not covered by them.

Various interrogatories and answers thereto have been fully covered by testimony taken in open court and require no further discussion at this point.

The subject matter of these claimed inventions relates in one way or another to the art of manifolding and means for facilitating the removal of sheets from piles of sheets interleaved with carbon paper, and particularly these sheets arranged in continuous form in such manner as to permit one manifolded set to be torn off and deleaved without removing the continuous strip from the typewriter, billing machine or teletype. The gist of the matter is that about 20 or 25 years ago billing machines and continuous strip manifolded stationery

became very much a necessity in offices handling large numbers of copies of forms, and it immediately brought forth a real torrent of so-called inventions. It was desirable to make several copies of an order or invoice at one time, it was necessary to separate the carbons from the worksheets, and it was convenient to have this type of stationery put up in continuous form so that the work could proceed from one order or invoice to the next without removal from the machine.

The record discloses that somewhere between 30 and 40 persons almost simultaneously discovered different ways of accomplishing this office trick, and a complete examination of all of the patents in suit with their file wrappers and all the record discloses of the dozens of applications which were filed and interferences which were declared indicates that all arrived at about the same solution at about the same time; that in some of them a corner was torn off, others were gummed along one edge with perforated lines for detachment, some were put together with staples, and in some cases stitches were used. It would prolong this opinion to the thickness of an ordinary dictionary to attempt to describe the trifling details by which this simple office routine procedure was solved. It is enough to say as to the whole batch of patents that none of them shows any inventive genius, that they are only different ways of performing a routine office procedure.

If one could find a stenographer who would admit 40 years of service she would tell you that it was always her practice to start four or five blank sheets of paper into her machine so as to leave an open space at the top and then interleave her carbon and turn the roller so that the carbon would be sticking out at the bottom. Sometimes they used pins, as mentioned in one of the Brenn specifications; sometimes they used paper clips; and perhaps now they use bobby pins, which were not in existence so many years ago. I am unable to find that anything has been added except perhaps the fanfolding, which in itself was hardly an invention. Johnson shows continuous strips coming off a roll, but any one knows that such strips would not possibly be in registration as shown by his drawing, and admittedly it was never used commercially.

A great deal is said about putting the staple in the line of weakening in the Brenn patents, but it was demonstrated in open court, and can be demonstrated in any court, that stationery of that type works just as well without the staple as with it, that the only thing the staple could possibly do would be to get into the typewriter and under the roller.

It is impossible to understand this case without careful examination of the activities of A. A. Johnson, patentee in No. 2,258,573, assigned to the plaintiff apparently before it was born.

Johnson is not a member of the bar, but is a licensed patent attorney and has been since 1918, and has been associated with the plaintiff for the last 27 years and has been familiar with the manifolding industry since 1912. Since 1925 he has been familiar with continuous carbon strips fastened together by various means, and with the entire industry for a longer period of time. His testimony shows that he is not only familiar with but is an expert in the field of continuous manifolding stationery. In response to an inquiry by the court as to what Mr. Johnson claimed over the prior art he said it was the facility of being able to strip the carbons from the records and not doing anything to the record sheet. This appears on pages 71 to 73 of the transcript, and is the sum total of everything that Johnson claims to have invented.

It appears from the record, and the court finds, that Johnson was called into this situation by Brenn for the express purpose of devising some means of evading or avoiding the prior art, and that as long ago as 1926 he was given this problem by the plaintiff to solve, and that everything he did was for the benefit of and in the employ of the plaintiff, and that in 1928 he hit upon the idea upon which he now claims a patent.

In order to understand the legal aspects of this case it is necessary to make a rather laborious anaylsis of the file wrappers in connection with the various patents, and

in order to be as brief as possible I will refer only to the Johnson patent because all of the others follow the same pattern.

As above noted, Johnson was employed for the purpose of inventing something, and pursuant to that duty on January 12, 1929 filed the original application with 10 claims. On July 5, 1929 the Examiner rejected claims 1 and 7 for functionality and for being indefinite and inept. He rejected claims 2, 3, 4, 5 and 6 for duplication and functionality. Claim 8 was objected to as ambiguous; and claim 9 was rejected as being impractical and for functionality. Claim 10 was rejected for statutory reasons. This left of his original application only claim 8, which well might have been rejected for repetitiveness.

Johnson amended by correcting some typographical errors, cancelling claim 10 and adding new claims 11 and 12, supported by a long argument.

On October 20, 1929 the Examiner rejected some of his claims for prolixity and lack of functionality, inaccuracy and as being merely in regard to the use of the article.

At this point Johnson took his full six months and in April 1930 added trivial amendments, with considerable argument.

In June 1930 the Patent Office rejected claims 1, 7 and 8 for prolixity, 2 to 6 and 11 for functionality and lack of invention, and rejected claim 9 for indefiniteness and lack of invention.

Again Johnson took several months, and in October 1930 amended by adding claims 13 to 29, accompanied by a long written argument.

In November 1930 the Patent Office suggested certain claims for the purposes of interference, and required Johnson to adopt them or suffer a disclaimer under the rules of the Patent Office. Johnson complied with this request in December 1930, and this brought the total number of his claims pending up to 49. The Patent Office thereafter suggested 3 additional claims for purposes of interference, which Johnson again accepted, bringing the number of claims up to 52.

On December 22, 1930 the Patent Office suggested 2 additional claims for purposes of interference, which brought the claims up to 54.

On April 14, 1931 the Patent Office declared interference No. 61, 454, mentioning, in addition to Johnson, the following named applicants for patents deemed in interference:

| | |
|---|---|
| Leland Ingersoll, | Niagara Falls, N. Y. |
| Otto Blitz, | Oakland, Cal. |
| Edward Hano, | Holyoke, Mass. |
| Urban F. Gochoel, | Dayton, Ohio. |
| Louis M. Snyder, | Brooklyn, N. Y. |
| Walter R. Baker, | Chicago, Ill. |
| John Q. Sherman, | Dayton, Ohio. |
| Edward Kirby Bottle, | Elmira, N. Y. |
| Joseph Loweth, | New York, N. Y. |
| Herbert Gordon Scott, | Whitestone Landing, N. Y. |

On April 14, 1931 another interference was declared, requiring Johnson to file 2 additional claims, which he did under protest. This interference was numbered 61,-455, and named the same parties applicant.

On the same date, April 14, 1931, another interference, No. 61,456, was declared with 2 additional suggested claims, naming some of the same parties applicant.

On the same date another interference, No. 61,457, containing 6 suggested additional claims, was declared as to Gochoel, Johnson, Sherman and Snyder.

On the same date, still another interference, No. 61,458, was declared with 9 suggested additional claims against some of the same parties.

On the same date interference No. 61,460 was declared with 2 additional claims involving Barker, Johnson, Sherman and Snyder.

On the same date, interference No. 61,461 was filed, with 3 additional claims involving those above named and, in addition thereto, an application by Johnson, Hutchinson, Reid of Jamestown, N. D.

On November 11, 1931 the Examiner added new parties to interference No. 61,454, namely:

| | |
|---|---|
| David J. Johnston, | Kew Gardens, L. I. |
| Walter F. Wallace, | Winnetka, Ill. |
| Frank Harvey, | Chicago, Ill. |
| George L. Fulk, | Mentor, Ohio. |

And in interference No. 61,455 the last-mentioned parties were added; and also in interference Nos. 61,456 and 61,458.

On August 20, 1932 interference No. 64,447, involving 3 claims, was declared, involving, in addition to all of those above named, one John Stuart Fleming, of Niagara Falls, N. Y.

In December 1932 Johnson again amended his application by adding 7 additional, claims, bringing the total up to 61, and adding additional remarks.

In the same month, on the same day, apparently in a separate communication, Johnson added 2 more claims, bringing the total up to 63.

On February 28, 1933 Johnson again amended by adding 2 more claims, bringing his total up to 65.

On May 20, 1933 this was the state of the record when the contract, Plaintiff's Exhibit 52, was executed, settling certain differences between the American Sales Book Company, Limited, and the plaintiff in this suit, and which is self-explanatory.

On September 13, 1933 another interference, No. 66,909, was declared involving 2 claims, involving Bottle and Johnson.

On the same date, September 13, 1933, interference No. 66,910 was declared, involving Bottle and the two Johnson patents.

On June 28, 1934, another interference was declared between the Johnson and Bottle patents.

On June 18, 1934 interference No. 68,889 was declared again involving Johnson and Bottle.

Just before the declaring of these two last-mentioned interferences, Standard Register Company and Autographic Register Company had executed three cross-licensing agreements, referring to 13 patents and 10 interferences. In this contract it is recited as one of the desires of the parties to settle all pending interferences in the Patent Office.

Notwithstanding these contracts and the expressed desires of all the parties involved to terminate their interferences and expedite matters in the Patent Office,

Johnson continued his dilatory and delaying tactics. In February 1935 he again amended his application by adding 3 claims, bringing the number up to 68.

In the same month he received notice of rejection of his claims 66, 67 and 68.

In March 1935 he responded to this by filing an extensive written argument in support of his purported claims, to which the Examiner immediately replied, again rejecting them.

Thereafter Johnson filed an extensive written argument in the form of suggestions.

On April 4, 1935 there was filed a long affidavit to the effect that it had been a common practice among stenographers to leave the ends of carbon papers extending at one end and short at the other. Just why this obvious and wellknown fact had to be made the subject of an affidavit I am unable to understand.

While all of this was going on, Plaintiff's Exhibit 23 was executed, and it was well known to Johnson, because he was the patent lawyer for the plaintiff and concerned with and had knowledge of all of the pending interferences and existing patents. In this agreement American Sales Book Company represented itself as being the owner of three patents and 20 applications then pending. The plaintiff represented itself as owning three patents, all issued to Johnson, and 16 applications then pending. The contract recites that the parties thereto were involved in 27 interferences with each other, and that they desired to terminate these interferences and determine all questions of priority between themselves without going through all the formal procedure of the Patent Office, with mutual exchange of rights and licenses and granting each other royalty-free cross-licenses. They also agreed to promptly cooperate with each other in all the interferences mentioned, to terminate the interferences as soon as possible.

Within the limits of this court's understanding, this whole mess in the Patent Office should have been promptly closed at that time.

Notwithstanding this agreement, and nearly two years thereafter, in July of 1936 Johnson added claims 69 and 70 to his pending application in connection with interference No. 64,447, which was one of those specifically mentioned in the contract.

A year later, in July 1937, Johnson added claims 71, 72, 73, 74, 75, 76, 77 and 78, involving interference Nos. 61,454, and 61,458, which were supposed to have been settled by the contract made more than three years before.

In September of 1937, after struggling with these amendments and the ten interferences which had been previously settled, the Patent Office rejected many of them and reminded Mr. Johnson that he had no right at this stage of the proceedings to demand consideration of interjected new issues such as were shown by claims 71 to 78 of the last amendment, and that they were rejected upon the ground that by failing earlier to present them the applicant had lost his right to present them. In this same communication the Patent Office warned Johnson that any claims presented in any future amendment which would require a new search or the making of any new ground of rejection would not be considered on its merits but would be rejected and that the action on all claims would be made final. In this communication Johnson was also warned that it was his duty under Patent Office Rules in amending after the first action to clearly point out all the patentable novelty which he thinks the case presents in view of the art disclosed by references cited and the objections as made. His attention was also called to rule 69 of the Patent Office, which imposed upon him the obligation to make a bona fide attempt to advance the case to final action, and called his attention to the fact that he had had ample opportunity to file all the claims requisite to cover his alleged invention.

Thereafter Johnson made some very immaterial cancellations, and added a new claim No. 79, accompanied by a protest against the action of the Examiner, requesting reconsideration of various claims and adding some sketches.

In November 1937 interference No. 74,496 was declared between Johnson and Sherman. Neither one of them had any interest in the subject matter because they had both assigned, and their respective rights were covered by the agreement of 1934. Nevertheless they continued and they proceeded before the Patent Office, and more than three years later, in March of 1941, Johnson added an amendment to his claims 14, 15, 16, 17, 18, 19, 24, 25, 27 and 28, cancelled claims 20, 21, 22, 23, 71, 72, 73, 74, 75, 76 and 78, and at the same time added new claims numbered 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92 and 93. To this he added a long explanation, amounting to a written argument.

Later in the same month he added a supplemental amendment, making trifling and immaterial suggestions.

On May 11, 1941 Johnson was notified of the allowance of his patent with 45 claims, and he immediately filed a petition for a large number of corrections and modifications therein, accompanied by a long written explanation.

On June 2, 1941, Johnson filed an amendment under Rule 78, further amending the claims before issuance of the patent. This is a very lengthy document, occupying several typewritten pages with reference to 19 claims.

On June 26, 1941 Johnson filed a supplemental oath in the Patent Office, reciting himself to have been the sole and original inventor of everything contained in all of the amendments and all of the claims. The court does not believe that this oath is strictly true. It is impossible that during all of these years, with all of the other inventors involved, with all of the interferences that have been settled by agreement and with all the applications that have been assigned to Johnson's client, he could have failed to pick up some of the ideas from others.

When Johnson was finally notified of the allowance of his patent with 45 claims he took within a few days of the full six months allowed him by law, and finally permitted the patent to issue October 7, 1941, which was twelve years, eight months and twenty-five days after filing his original

736

application, and the patent as issued bore very little resemblance to the original application which had been made more than twelve years previously.

It is impossible from this record for the court to make a true assessment of all the supposed inventions which are mentioned in the record, because those matters were not put in evidence. It is entirely clear, however, that in addition to those mentioned in the prior art, including Bottle and Johnson and Brenn and many others, at least ten other inventors had ideas sufficiently similar to the matters in suit to cause the plaintiff and the American Sales Book Company to buy them all up and take assignments, in an obvious effort to tie the matter in a knot. The obviousness of this effort is conclusively shown by the dilatory tactics pursued in the Patent Office long after they had everything under control.

■ In this case there is a striking resemblance to several prior cases which are binding on this court. Thus, in Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, on page 453, 44 S.Ct. 533, 68 L.Ed. 1098, the United States Supreme Court concurred in the view of the Circuit Court of Appeals, 6 Cir., 281 F. 680, in pointing out that where at various closely connected points of time and in apparent ignorance of each other various manufacturers arrived at approximately the same result, it was a strong circumstance tending to show lack of invention. Also, in Julius Kayser & Co. v. Rosedale Knitting Co., 98 F.2d 839, the Circuit Court of Appeals for the Third Circuit adopted the same view. This same doctrine was later reaffirmed by the United States Supreme Court in Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222.

■ In the case of Thomson Spot Welder Co. v. Ford Motor Co., supra, the United States Supreme Court held that the question of whether an improvement requires mere mechanical skill or the exercise of faculty of invention is one of fact. I believe, and therefore find as a fact, that none of the alleged patents in suit are inventions, but at the most improvements in technique or mechanical skill and are, therefore, void.

Even if I should be in error in this conclusion, the claims of the patents relied upon by the plaintiff are clearly anticipated in all of their important features by the prior art, which is so voluminous that I will refrain from quoting it in detail, but which is covered quite fully in the defendant's brief.

■ It is perhaps proper and necessary that I should make a further finding of fact, and that is that the plaintiff does not come into a court of equity with clean hands. I am forced to this conclusion by many reasons appearing of record and many others clearly to be inferred from the record. This suit in its entirety revolves around the witness and claimed patentee A. A. Johnson, and it is entirely clear that in everything that was done in this case, both in regard to his own claimed patent and those of Brenn, he was merely acting as a hired employe of the plaintiff and the plaintiff is charged with everything that he did and everything that he knew.

As pointed out above, he was hired for the purpose of trying to evade prior art, and in his first application he made a faint effort to do so but, as is also pointed out above, the final results which he obtained bear only a very faint resemblance to the patent which he reluctantly accepted more than twelve years later. In view of the various cross-licensing agreements, it is entirely clear to the court that the whole procedure in the Patent Office exercised on behalf of the plaintiff in this case was deliberately planned and intended to delay the actual issuance of the patent many years beyond the time when it should have been issued, if any were to be issued at all, and I so find.

If it be true that invention consists of a flash of genius then Mr. Johnson had 93 flashes at properly spaced intervals to create the greatest possible delay. No one on the witness stand was ever able to explain to the satisfaction of the court wherein there was any real or substantial difference between any of these so-called flashes of genius.

After the cross-licensing agreements were entered into it could have made little or no great difference to the plaintiff which of these many, many applications was matured into a patent, just so long as it could be delayed to the last possible moment. Indeed, from this record the court has no way of knowing what fine items of invention or mechanical skill were concealed in the numerous applications and interferences, because none of them was placed in evidence.

It is my conclusion from the direct evidence and legitimate inferences from the lack of evidence, that the plaintiff in this case deliberately intended, and with success, to abuse the patent privileges by dilatory and delaying tactics, and by agreements at least subject to some question, which were made with its principal competitors. I, therefore, find as a fact the plaintiff does not come into a court of equity with clean hands and is not entitled to any relief in this court.

It is, therefore, the judgment of this court that the complaint and amended complaint of the plaintiff herein be dismissed for want of equity, and that the defendant have judgment for costs.