AUTOGRAPHIC REGISTER CO. v. PHILIP HANO CO., Inc.

Civ. A. No. 50–627.

United States District Court
D. Massachusetts.

Dec. 3, 1951.

———◆———

Thomas J. Byrne, New York City, Clifford H. Byrnes, Boston, Mass., for plaintiff.

Richard F. Walker and Roberts, Cushman & Grover, all of Boston, Mass., Maurice V. Seligson, New York City, for defendant.

McCARTHY, District Judge.

This is an action under the Patent Laws of the United States, charging the defendant with infringement of two patents, each for alleged improvement in "manifold stationery".

Plaintiff, a New Jersey corporation, is the assignee of Letters Patent No. 2,082,-730, issued on June 1, 1937 to Carl W. Brenn, and of No. 2,258,573, issued on October 7, 1941 to Arthur A. Johnson.

In the 1920's there was in commercial use what is described as "continuous carbon-interleaved forms", consisting of zigzagged stacks of record and carbon strips interleaved, with lines of perforations dividing the forms in the record strips and similar lines of weakness or severance cut into the carbon strips interleaved therewith, so that one "set" of forms could be torn off and deleaved without removing the continuous strips from the typewriter, billing machine or teletype. This stationery had the advantage of speeding clerical work and reducing clerical expense. Cf. Brown's U. S. patent No. 1,641,620, issued in 1927.

Difficulty was encountered when the stationery was used in a friction-feed machine such as the ordinary roundplaten typewriter, in that the superposed strips would not remain in registration. The strips nearest the platen would "creep", and the operator of the machine would have to "jog" the strips into registration frequently. One obvious expedient was to fasten each set of forms with a staple. Cf. Greig's U. S. patent No. 2,066,346 granted in 1937, application for which was filed December 17, 1926. When, however, the staple is placed through the body of the forms, unless provision is made for severing that portion of the forms and interleaved carbons in which the staple is placed, the operator must take time to remove the staple before the set can be deleaved. Briefly, Brenn's contribution to the advancement of the art, was the placing of the staple through the line of perforations. This held the stapled sheets against relative movement while they were in the machine, and when a set was torn off, the staple was released from its engagement. Unless, of course, the set which was to be severed was drawn beyond the machine itself (beyond the tilting paper table in modern typewriters), there was danger that the free staple would fall into the typewriter.

There was also the early problem of facilitating separation of the carbons from the record sheets once a set had been severed. One method of accomplishment was provided by so-called "cut corner" stationery. Cf. Bottle's U. S. patent No. 1,736,427 granted in 1929 on an application filed in August of 1926. In the "cut corner" stationery, each of the record sheets in each set had a forward corner clipped away by a diagonal cut, while each of the carbon sheets in each set had the opposite forward corner clipped away to provide finger grips for deleaving the records from the carbons.

Johnson obtained the same result without "mutilating" the record sheets by placing the perforated lines of the carbons at least partially out of registry with the severance lines of the record strips. Severance of a set left a portion of each carbon protruding from one end of the set and a vacuity in each carbon at the opposite end of the set providing finger grips for grasp-

ing the carbon and record sheets and separating them.

█ It was agreed at the trial that, if the patents in suit are valid, the defendant's accused structure infringes both of them. I find, however, and rule that the Brenn patent No. 2,082,730 and the Johnson patent No. 2,258,573 are invalid for lack of invention. Their alleged advances contributed nothing beyond the ability of one ordinarily skilled in the art.

An object of Brenn's "invention" is to provide a "manifolding pack comprising a plurality of superposed printed worksheet strips with interleaved carbon or transfer strips so improved that the separate printed worksheet strips are held in accurate registration with each other, and the carbon or transfer strips are held in operative position between the worksheet strips", and so that "the operation of severing or separating one set of written forms from the pile of strips automatically renders the holding means inoperative, whereby the operation of severing or disassociating the individual forms of a written set is obviated".

No one of the prior art patents shows exactly the combination of elements described by Brenn. On the other hand, the Brown patent shows the continuous interfolding packet in detail, and, as stated hereinbefore, the use of staples to keep the strips in registration was not new. Greig's U. S. patent No. 2,066,346, granted in 1937. The choice of a spot in which to place the staple most advantageously (up to that time) was all that Brenn offered, and while this might have been both new and useful, it did not amount to "invention" or "discovery". Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. It is worthy of note, in passing, that even the concept of placing a staple *through lines of perforations,* which is the very heart of Brenn's brainchild, was not original with Brenn. Carter's U. S. patent No. 627,481 shows the use of staples in such manner in a sales book. Although Carter's staples stay operative for *remaining* sheets until the last sheet is torn off, they become *inoperative* as to record sheets which have

been severed, just as does Brenn's staple become inoperative as to severed sets of forms. While Carter did not suggest a succession of staples, he did show, before Brenn, staples set on lines of weakness.

Johnson's carbon tab structure, which discloses no staple, provides a convenient but obvious means for deleaving carbons, by offsetting at least partially the lines of severance in the carbons from those in the record sheets.

There was evidence at the trial, and it is not disputed, that for many years prior to 1928, typists, when working with sheets of blank paper and carbon, so interleaved the paper and the carbons that the carbons would project at the bottom, thus facilitating separation of paper and carbons when the work was completed. Johnson simply applied the same idea, or used the same trick, in dealing with *continuous* carbon-interleaved forms. The same notion occurred to many independent applicants for patents at about the same time as Johnson, which resulted in the institution of a number of interference proceedings in the Patent Office. The fact that the structure occurred to so many individuals at the same time is evidence that the "advance" was fully within the ability of the man ordinarily skilled in the art.

The alleged invention of Johnson was not anticipated by any earlier patent. What he offered was an improvement over the prior art, but an improvement which does not constitute invention. Brown provided the zigzagged stack of continuous carbon-interleaved forms. Bottle contributed the first practical method of separating carbons after severance of a set of forms, and Johnson improved upon the Bottle disclosure with the use of tabbed carbon.

Mallen's U. S. patent No. 1,032,918 shows a single carbon sheet with a vacuity on the top or forward edge and a tab at the bottom. These are *not* created as the result of a severing operation. As a matter of fact, the vacuity and tab in Mallen do not complement each other in size. The basic value of tabbed carbon appears there, however, and the application of the principle to continuous carbon strips de-

pends only upon the vacuity and tab being of the same size and shape.

Not every idea is patentable, and a study of the Brenn and Johnson structures convinces one that neither contribution to the art is worthy of the right to exact tribute from the public. "Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438.

The plaintiff has met and overcome the presumption in favor of the validity of these patents convincingly. The conclusion of invalidity makes a discussion of the other defenses unnecessary.

■ From July 21, 1942, the defendant was licensed by the plaintiff under the Johnson and Brenn patents in suit. The license was written to continue in force until October of 1958. There was no provision for a right to an earlier termination by the defendant.

In 1949 these patents were held invalid by the United States District Court for the Northern District of Illinois, E.D., Autographic Register Co. v. Uarco, Inc., D.C., 86 F.Supp. 730. The defendant was not a party to that action. Defendant upon learning of the judgment contacted the plaintiff through its attorney, Mr. Seligson, for the purpose of repudiating the 1942 license. On September 7, 1949, Mr. Seligson had a telephone conversation with Mr. Brenn, the plaintiff's vice-president. Mr. Seligson said that he was attorney for the Philip Hano Co. of Massachusetts, and that the defendant would not consider itself liable for future royalty payments. Mr. Brenn stated that his company was confident that the decision would be reversed on appeal. The Hano attorney then stated that he would recommend an arrangement whereby royalties accruing under the license agreement would be paid "in part or in full in escrow", subject to refund if the District Court's decision was affirmed. Mr. Brenn did not accept the proposal, but stated that he would have Mr. Johnson, his patent attorney, communicate with Mr. Seligson.

Later that day Mr. Johnson made the expected call, stating that he was Mr. Brenn's patent attorney. Mr. Seligson repeated the conversation he had had with Mr. Brenn, asserting that so far as the defendant was concerned, the license agreement stood denounced, so that defendant could be sued as an infringer, but that he, Mr. Seligson, would advise the defendant to offer future royalty payments on the understanding that if the plaintiff declined to agree to contingent refund, it should return checks, whereupon the defendant would make no further payments. He stated if the plaintiff accepted and retained payments, such retention would constitute an undertaking to repay in the event that the plaintiff's appeal failed. Mr. Johnson answered that if Autographic Register was not entitled to the royalties, "he (Mr. Seligson) would have his relief whether they were paid under protest or not". In October of 1949 the plaintiff sent a check bearing the statement "this payment is made under protest and without prejudice". The check was accompanied by a letter reading, "In conformity with the telephone conversation had between our attorney, Mr. Maurice V. Seligson of New York, and your attorney, Mr. A. A. Johnson, enclosed herewith please find royalty check which is paid under protest and without prejudice". The check and the letter were referred to the personal attention of Mr. Brenn and by him discussed with his patent attorney. Brenn was aware of the defendant's last proposal and understood that the check was submitted as an offer pursuant thereto. The plaintiff accepted and retained the proceeds from the check without communicating with the defendant.

In January and May of 1950, the defendant believing that its offer had been accepted, sent the plaintiff two more checks checks with similar endorsements and covering letters which the plaintiff appropriated without communication with the defendant. The three checks totaled $6,999.49.

Following the Circuit Court of Appeals decision in Autographic Register Co. v.

---

Uarco, 7 Cir., 182 F.2d 353, affirming the judgment of the District Court, the defendant made demand on the plaintiff for repayment of the sum represented by the three checks. The plaintiff refused. Thereafter the parties entered into an agreement dated June 28, 1950, terminating their license relationship as of that date without prejudice to the right of either party with respect to financial claims against the other under prior agreements. The defendant seeks by way of counterclaim to recover the $6,999.49, arguing that its attorney made an offer to plaintiff in his conversation with Johnson on September 7, 1949, that the plaintiff's cashing the checks without comment constituted an acceptance, and that a supplemental contract was made thereby under which the plaintiff became obligated to refund the proceeds from the checks upon affirmance on appeal of the invalidity adjudication of the patents in suit. The plaintiff prays for an accounting of royalties due from April 1, 1950 until June 28, 1950.

I conclude and rule that an offer was made by the defendant to the plaintiff on September 7, 1949, which was intended to effect a modification of the original license agreement. The plaintiff through Mr. Johnson did not reject this offer and the subsequent act of the plaintiff in cashing the checks and retaining the proceeds therefrom constituted an acceptance of it. The license agreement was thereby modified and the obligations of the parties thereto were correspondingly changed. The plaintiff, therefore, is obligated to the defendant in the amount of $6,999.49 with interest from June 29, 1950, the date of the defendant's demand therefor. Under the supplemental contract the defendant is not obligated to pay the plaintiff anything on its activities subsequent to March 31, 1950, and the plaintiff would be obligated to refund to the defendant any payment made thereunder on activities subsequent to that date. The complaint and the plaintiff's counterclaim are dismissed. The defendant shall have judgment on its counterclaim. The defendant's prayer for costs is allowed and that for counsel fees is denied.