### KEEFE v. GORA et al.
### Civil Action No. 733.

District Court, D. Connecticut.
Aug. 10, 1944.

Rockwell & Bartholow, by Edmond M. Bartholow, all of New Haven, Conn., and Kwis, Hudson, Boughton & Williams, by A. J. Hudson and W. E. Williams, all of Cleveland, Ohio, for plaintiff.

Fitzgerald, Foote & Fitzgerald, by Jeremiah D. Shea, all of New Haven, Conn., and Cameron, Kerkam & Sutton, by Loyd H. Sutton, all of Washington, D. C., for defendant.

HINCKS, District Judge.

This action under R.S. § 4915, 35 U.S. C.A. § 63, has been brought as a result of two interferences between the parties hereto in the Patent Office, viz., No. 76,583 and No. 76,584, each comprising three claims. The Patent Office awarded priority to Gora, one of the defendants herein and assignor to the co-defendant Jenkins Brothers, and on Gora's application, Serial No. 134,863, filed April 3, 1937, patent No. 2,293,132 was issued on August 18, 1942, including all the claims in interference.

The subject matter of the controversy lies in the field of air valves—such valves as are used to hold the air in the inner tubes of motor vehicle tires. More particularly, the field is confined to so-called capless valve assemblies having removable and replaceable cores. In this field, it should be explained, "capless" valve means one which does not contemplate the use of a detached cap screwed manually upon the nipple of the stem, to exclude dirt.

### Findings

1. The prior art showed capless valves in which the core is not removable, e. g., defendants' Exhibit 21. In these a cap permanently fixed on the outer end of the pin of the core was so dimensioned and disposed that when the valve was in closed position the pin-cap substantially filled the orifice of the tubular stem and thus prevented the admission of dirt and moisture—a function which in older valves had been accomplished by screwing a detached cap upon the nipple of the stem which was exteriorly threaded for that purpose.

2. The prior art also showed a wide variety of valves with removable cores but without device other than the detached cap of the older art just described to prevent the admission of dust. The valves of this type which had the widest commercial use all depended upon the cooperation between a core and the tubular insert or ferrule of a stem in which the core was seated. The core included a tubular barrel, the exterior of which carried circumferentially a band of packing material which served to prevent the passage of air between the core and the stem when the core was suitably seated against interior shoulders of the tubular insert of the stem. Through the barrel, and constituting a part of the subcombination of the core, extended a pin at the inside end of which was permanently fixed a valve device consisting either of a cup or tapered cone which in cooperation with the bottom of the barrel served as a seal to prevent the passage of air through the barrel. Above and outside the barrel was a tubular plug, generally swiveled into the top of the barrel, threaded on the exterior to cooperate with the interior threading on the metal insert of the stem. In some, at the top, or outer, side of the plug its side walls were extended to form two lugs each diametrically opposed to the other. In others, the plug, instead of terminating in two lugs as just described, was surmounted by a bar or bridge across its diameter; in this construction the bridge was apertured to permit the passage and reciprocation of the pin. In one form at least, e. g., the Bridgeport Brass Company valve, the entire side walls of the plug except for the two sections thereof which supported the bridge were cut away so that it was shaped like a slab instead of a tube; but this like the others was threaded on the exterior of the side wall sections supporting the bridge. In all these valves the pin was actuated by a spiral spring

surrounding the pin and located inside the barrel or above or below the barrel, which in the absence of opposing (inward) pressure held the valve device on the inner end of the pin in closed position, leaving the outer end of the pin projecting into the tubular orifice of the stem with the tip of the pin just inside of the plane of the lip of the stem-nipple which, as observed above, was generally threaded on the exterior to accommodate a detached dust cap to exclude dirt from the chamber of the insert and the barrel beneath it.

3. In the type of valves just described to accomplish the assembly of the overall combination, the core was manually inserted into the insert of the stem. A valve tool was then required so designed that its working end could be inserted into the insert of the stem and by engagement between cross-slots in the valve tool and the lugs or bridge of core-plug screw the plug into the insert and thus bring the packing-band on the exterior of the barrel into a sealing position against the shoulders of the insert. A detachable dust cap, such as Exhibit 64, often served as this valve-tool, so designed that its top was drawn into a tube dimensioned for insertion into the orifice of the insert and cross-slotted for engagement with the lugs or bridge of the plug.

4. The claimed inventions which came into interference as aforesaid proposed a modification of the structures described above whereby the outer end of the pin terminated in a cap, like the cap on the pin of the non-removable core described in Paragraph 1 above, permanently and rigidly affixed thereon so dimensioned and positioned that with the valve closed the pin-cap would substantially fill the mouth of the stem and thus exclude dirt and moisture from admission into the chamber of the insert and the barrel of the core. This feature of the claimed invention obviated the need for the detached dust-cap of the older art which was objectionable in that it had to be removed every time the tire was inflated and due to the hazard of loss frequently left the device exposed to the admission of dirt affecting the effectiveness of the air seal.

5. The modification just described, however, created a mechanical problem. For the new cap on the modified pin served not only to close the chamber of the insert to dirt but also precluded the inser-tion of the valve tool described in Paragraph 3 above which theretofore had been the conventional means of screwing the plug into the insert and thus bringing the core into its operative position. To meet this difficulty, the plaintiff conceived an arrangement whereby (1) a pair of lugs were fashioned on the inner face of the expanded pin-cap and (2) a slot suitable for screw driver or similar tool was machined on the outer side of the pin-cap. And the defendant's conception was the same except that instead of lugs on the inside of the pin-cap he used a slot.

6. To operate these modified devices, it was thus necessary against the pressure of the spring to push the pin-cap inward until the lugs or slot on its inner face were in position to engage or mesh the lugs or bridge on the top of the plug. This accomplished, all that remained was to impart a rotary motion to the plug through the pin-cap, thus screwing the core into position. And the application of the necessary force, first in an axial then in a tangential direction, could conveniently be accomplished through a screw driver or similar tool properly dimensioned for insertion into the mouth of the stem.

7. For purposes of inflation and deflation when the core is screwed into operative position, in order that the passage of air might not be obstructed by the modified pin-cap both plaintiff and defendant provided, as a part of their claimed invention, that the chamber inside the mouth of the insert or stem in which the pin-cap reciprocates should be recessed so that, except when the valve is in closed position with the pin-cap closing the mouth of the stem, there should be ample room for the passage of air around the pin-cap. Thus when the pin-cap is pushed inward by an air-chuck the air may pass around the pin-cap and through the barrel into the tire.

8. I find, as the Patent Office found, that the plaintiff conceived his claimed invention as early as July 14, 1936.

9. I find, as the Patent Office found, that the defendant Gora conceived his claimed invention as early as August, 1936, and that he failed to prove any earlier conception date.

10. Not later than July 14, 1936, the plaintiff incorporated his conception into a model core, Plaintiff's Exhibit C, and a model stem, Plaintiff's Exhibit D. This

model core was made by accomplishing a modification of a commercial specimen of the Dill core—a type of valve which had theretofore by wide commercial use been proved to be entirely operable. To the outer end of the pin on this core, the plaintiff soldered a cap upon the inner face of which two lugs, diametrically opposed, were fashioned. And the outer face of this cap was slotted. (That this cap was fashioned from a Dill plug part explains the peculiar appearance and form of the model but is without legal significance.)

11. The Patent Office accepted the proofs showing that this model was made not later than July 14, 1936, as establishing that as the date of conception. With that finding I am entirely in accord.

12. On March 31, 1937, the plaintiff filed his application, Serial No. 134,114, for a claimed invention in this field.

13. On April 3, 1937, Gora filed his application Serial No. 134,863, upon which after the interference proceedings Patent No. 2,293,132 issued on August 18, 1942. This application and patent included the six claims in interference.

14. On October 19, 1938, plaintiff filed his application Serial No. 235,836 in which he included the six claims in interference. as suggested by the Patent Office.

15. The plaintiff contended in the interference proceedings as at the trial herein that his 1937 application (Paragraph 12, supra) disclosed the invention defined by the claims in interference and thus served as a constructive reduction to practice. This contention was one which was overruled by the Patent Office, and upon which, in my view of the other features of the case, there is no need for me to rule. The plaintiff also contended that the manufacture of the models, Exhibits C and D, as described in Paragraph 10 above, as early as July 14, 1936, in itself, or at least when shortly thereafter followed by a manual insertion of the core (Exhibit C) into the insert (Exhibit D), constituted a reduction to practice as a result of which he was entitled to an award of priority over Gora. The Patent Office overruled this contention also. And while this issue also becomes moot if I am right in my ultimate conclusion that the plaintiff's disclosures fail to show patentable invention, nevertheless, since the issue relating to the priority of the rival applicants furnished the chief controversy at the trial, I will state my views thereon.

### Opinion.

The Patent Office held that this model, Exhibits C and D, without testing under service pressures when assembled was insufficient in itself to constitute a reduction to practice, and that consequently the mere assembly of Exhibit C into Exhibit D by the application of the thumbnail to the slotted pin-cap was insufficient. For aught that appeared in the proofs, when the core, Exhibit C, had apparently been fully seated in the insert by the thumbnail, it might not in fact have been seated with sufficient firmness to prevent leakage between the barrel and the stem. And so it was thought that a test under pressure was necessary to reduce the device to practice. With that ruling I am unable to agree.

For the core of the model was a commercial specimen of a type the operability of which had already been fully tested under service pressures by widespread public use. Obviously the cap on the outer end of the pin could not affect the air seal accomplished by the cooperation between the barrel and the valve cap on the inner end of the pin. For these two parts which alone accomplished the air seal and the means for their cooperation were present in the model precisely as they were in the commercial specimen. A pressure test of the seal between valve-cup and barrel was therefore wholly superfluous.

I think it was also unnecessary to test the models for the air seal between the core and the stem. For here, too, widespread practical use had demonstrated that the Dill core could be screwed into a cooperating stem or insert with sufficient firmness to be airtight, and hence operable, through the use of a simple valve tool, or a nipple cap, such as is in evidence as Exhibit 64. And it is, I think, mechanically obvious that a rotary movement could be imparted to the plug by the pin-cap of the model, Exhibit C, as well as by a valve tool such as plaintiff's Exhibit 64.

The Patent Office ruling apparently implies that possibly the mechanical means present in the model were inadequate for the application of sufficient force to screw the core firmly into place. But I should suppose that the sufficiency of a force, applied as here in a circumferential or tangential direction, would depend upon the length of the diameter of the circular part receiving the force and the length of the blade-edge of the screw driver or similar

contemplated tool which is used to impart or transmit the force. Here the parts receiving the force are, directly, the pin-cap (through its outer slot) and, indirectly, the plug with its lugs (through the pin-cap). The plaintiff's model has a plug of the same diameter and hence the same capacity to receive force as the commercial core of proved operability; For the model is a commercial core. And the pin-cap of the model is so dimensioned that by visual inspection its slotted diameter is seen to be substantially as long as the diameter of its plug. Thus the two parts of the model which receive the force have the same mechanical means and capacity to receive force as the tested commercial specimen. And the core of the model even when inserted in the stem obviously is adapted to cooperate with a tool having as much capacity to impart force as the tools of tested operability. For into the mouth of the stem a screw driver may be inserted having a blade-edge as long as the diameter of the older valve tool.

And even if the slot on the pin-cap were somewhat shorter or if through the indirect transmission of force by the model there should be some leakage as from friction, any shortage of force thus resulting could readily and obviously be compensated for either by a more generous output from the fingers or by a bigger handle on the tool without the slightest modification of the model. In other words, the model, like the conception which underlies it, contemplates the application of sufficient force for its operability and contains mechanical features fully adequate for that application.

■ The defendant attempts to support the ruling of the Patent Office by the contention that the model, Exhibit C, has not been shown to have sufficient structural strength to be operable. It is true that the cap was merely soldered to the pin in the model and, for aught that appears, due to the soft material used its slot might not stand enough pressure from a screw driver to firmly seat the core and accomplish the desired seal. But as to this, it must not be forgotten that the claimed invention does not purport to extend to the materials used or to the manner or means whereby the cap is fashioned or affixed to the pin. The fact is that the model actually carried mechanical means of obvious sufficiency in the light of commercial practice for operability. That being so, the strength of the model was immaterial and there was no need for a pressure test to reduce to practice.

■ Even though a high degree of proof be required to establish the priority of an inventor, the patent law is not so technical as to require him to demonstrate the obvious. For the purpose of determining whether practical tests are essential to accomplish a reduction to practice, the cases may be assigned to three classes according to their facts.

"The first includes devices so simple and of such obvious efficacy that construction of one of a size and form intended for, and capable of practical use, is held sufficient without tests in actual use. The second consists of those where a machine embodying every essential element of the invention, having been tested, and its practical utility for the intended purpose demonstrated to reasonable satisfaction, has been held to have been reduced to practice, notwithstanding it may not be a mechanically perfect machine. The third class includes those where the machine is of such a character that the particular use for which it is intended must be given special consideration, and require satisfactory operation in the actual execution of the object." Sherman v. American Telephone & Telegraph Co., D. C., 38 F.Supp. 360, 364; affirmed 2 Cir., 132 F.2d 321.

The case here, unlike the Sherman case, falls within the first class above described, and if the point required a ruling I should feel constrained to hold that the plaintiff not only conceived his claimed invention but also reduced it to practice in July, 1936, and hence was entitled to an award of priority.

■ It does not follow, however, that the plaintiff is thereby entitled to a decree herein authorizing the issue of a patent. For it has long been established that in actions under R.S. § 4915, even when as here the only issue directly raised by the parties is that of priority, the court will not order the issue of a patent unless satisfied that the claims involve patentable invention. Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502; Sinko Tool Co. v. Automatic Devices Corporation, 2 Cir., 136 F.2d 186. And I can find no such invention in the claims here involved.

The plaintiff was posed, or posed himself, with the problem of providing a dust

guard on the conventional tire valve with removable core. Surely, the notion of blocking the mouth of the stem was the obvious first step. Nor can it be said to involve any trace of true invention to accomplish this by a cap on the conventional valve pin, especially in view of the earlier and successful application of this solution to the valve without a removable core. Of all the parts of the core, the tip of the pin was in closest proximity to the mouth of the stem which it was desired to close, and the reciprocatory movement of the pin in the conventional valve made it more eligible than any other element of the core as a mount for such a closing cap.

With the head once located on the tip of the pin, all that remained was to contrive means to accomplish the rotation of the plug beneath under sufficient pressure to screw it into the insert. Heretofore this had been accomplished by the direct application of a valve tool equivalent to a specially adapted wrench. But now that the plug, due to the interposition of the enlarged pin-cap, could not be reached by the conventional tool, it lay in the field of mechanical skill rather than invention to accomplish the desired result by an indirect transmission of the required force. For, surely it is a practice well known to skilled mechanics to reach inaccessible parts thus indirectly. Thus to conceive the use of the pin-cap adapted to serve as an intermediate tool for the transmission of the necessary force, at least in the light of recent decisions, seems a solution too obvious to classify as patentable invention.

To be sure, a successful solution had to be adjusted to the reciprocatory movement of the pin. The axial position of the pin-cap when used as a wrench to screw the plug into place necessarily marked the inner limit of the reciprocatory movement of the pin: the outer limit of that reciprocatory movement must simultaneously leave (1) the pin-cap at the very lip of the stem-mouth if it was to serve as a seal against dust and (2) the valve cup on the inner end of the pin in contact with the barrel to close the valve. But the pin of the conventional valve already had a reciprocatory motion: To accomplish this new result all that was needed was a proper dimensioning of the pin and its cap in relation to the other cooperating parts. And of course the lugs or slot on the inner face of the pin-cap

had to be designed properly to mesh with the lugs or bridge of the plug beneath; also, the diameter of the pin-cap had to be dimensioned for its relation to the diameter of the tubular stem. All told, the problems involved were largely problems of mechanical design and the plaintiff's solution required less invention than that involved in the Mead patent which was held to be wholly lacking in patentable invention by the Supreme Court in Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. And the fact that the Patent Office had allowed the claims in interference (in 1936) before the Cuno decision had been reported (in 1941) somewhat mitigates my natural diffidence in taking a position at variance with the Patent Office.

I conclude therefore that the plaintiff's disclosure lacks patentable invention and that his action should be dismissed with costs.

A decree accordingly may be submitted, on notice unless notice is waived.