## NACHMAN CORP. v. L. A. YOUNG SPRING & WIRE CORP.

### Civ. A. 8722.

United States District Court
E. D. Michigan, S. D.

Sept. 28, 1951.

---

Edwin J. Balluff, Detroit, Mich. (Elwood Hansmann, Thomas F. McWilliams, Chicago, Ill., of counsel), for plaintiff.

Otis A. Earl, Kalamazoo, Mich. (Arthur H. Wrock and Cook, Beake, Miller, Wrock & Cross, Detroit, Mich., of counsel), for defendant.

LEVIN, District Judge.

This action is for alleged infringement of patent number 2,124,695, a spring assembly for upholstery, issued in December 1937 to William Gleason and assigned to plaintiff, the present owner.

I find that defendant's commercial product infringes the claims of the patent in suit. The only issue that requires discussion is that of validity, and the basic problem is whether or not the conception meets the standard of patentable invention.

The patent covers a spring assembly for use in upholstery. Plaintiff's commercial structure, allegedly made in accordance with the claims protected by the patent, is, however, used in inner-spring mattresses. The patent relates to an industry in which the prior art is extensive, and it purports to add, at most, a refinement to a product the essential elements of which have been understood and used for decades.

The patent was directed to minimize the tendency of the marginal springs and the frame of completed mattresses to buckle in the course of ordinary use because of the lateral strains to which they are subjected.

The claims, 9 in number, cover a spring assembly comprising an ordinary set of interconnected upholstery springs, the outer edges of which are overlapped at the top and bottom by rectangular metal frames made of flat resilient metal fastened by continuous helical wiring of such diameter and pitch as to hold the marginal springs and overlapping frame firmly in place, and prevent movement of the springs in relation to the border frame. The product is a spring that possesses a high degree of resistance to lateral pressures, whether caused by the upholstery padding along the edges of the mattress or ordinary use, but having, at the same time, a spring reaction that is uniform at all points, edge or center, with respect to longitudinal pressures.

Each of the three elements of the assembly—the springs, the border frame and the connecting tie wire—is admittedly old, and the combination is all that is claimed as patentable invention.

Although there is no doubt that the particular combination conceived by Gleason is new, the general concept of a spring assembly made by connecting a group of springs and attaching them by wiring to a metal border frame is old. Such springs have a long history in the bedding and upholstery industry, and before the turn of the century a patent was obtained (Bonnell, patent number 630,967) for the use of such a spring in an upholstered couch. Their use in inner-spring mattresses dates from the time of the introduction of such mattresses in the early 1920s.

The use of a flat border frame overlapping the extremity of the marginal springs of an interconnected group of springs is shown by two American patents, Reeves, 138,529 (1873) and Ehlenbeck, 1,868,279 (1932), in which the connection between the frame and terminal coils was effected by metal clips. Three other patents, Leeman, 2,029,076 (1936), Marshall, British 11,823 (1912), and Forster, British 324,993 (1930) disclose the use of helical tie wires to connect springs to a marginal frame. The frames of both Forster and Marshall are shown to be in overlapping relation to the marginal coils.

In a letter to the Patent Office dated April 28, 1938, the applicant emphasized that a patent on a combination was sought and that it could not be anticipated except by a "single prior disclosure of the whole combination operating in the same way to produce (the) same result by the same means * * *."

He further urged that patentable invention was to be found in the use of the flat border frame held tightly in a position overlapping the terminal coils of the marginal springs by continuous helical wiring and resulting in maximum resistance to movement counter to that of the border frame. A later letter indicates that the helical tie wire was to be "of slightly greater inner diameter than the width of the * * * (border frame) so that the helical may be caused to embrace the same without undue frictional resistance." The advantage of the combination was urged on the ground that the "resistance to buckling * * * is very efficient and permits the border frame * * * to exert lateral stresses on the spring assembly which will correct the slight variation in width and length of the latter, these variations being usually only a fraction of an inch." The assembly thus "retains its predetermined dimensions very efficiently and *·* * all of the springs engaged with the * * * (border frame) are held against all movement relatively to the (border frame)." The April letter distinguishes the Gleason claim from the prior art in that "the disclosures of flat rail frames are devoid of the degree of overlap of upholstery springs and the * * * tie-device * * * and the remaining disclosures include other cross-sectional shapes of frame-rails about which helical tie wires are disposed as a means for correcting upholstery springs therewith in a relatively loose state."

■ These statements made in correspondence and appearing now in the file wrapper of the Gleason patent are, of course, not controlling. The patent must stand or fall on the basis of the claims made in the patent itself. Nevertheless, they are valuable as giving some indication of a basis for finding patentable invention in a device which seems on a reading of the claims to add little to the fund of knowledge already available to the industry.

During the hearing I have had the benefit of inspecting a great many spring assemblies of various styles and construction produced by various manufacturers. There is no dispute that spring assemblies in which interconnected upholstery springs were joined to round border frames by helical wiring were commonplace when Gleason applied for his patent and had been used in inner-spring mattresses as long as such mattresses had been on the market.

Gleason himself did not consider at the time of his application that the mere substitution of a flat border rim for a round one, even though it has certain advantages, might be the basis of a patent monopoly. The right to the patent in the view of the plaintiff boils down simply to this—the use of a flat frame in an upholstery spring construction in combination with an overlapping and relatively secure position of such flat frame in relation to the terminal springs.

■ The court recognizes that a new combination of old elements or even a mere substitution of materials is not precluded as a matter of law from the area of patentable invention, B. G. Corporation v. Walter Kidde & Co., Inc., 2 Cir., 79 F.2d 20, but the evidence through which plaintiff has sought to prove invention in the present case is not convincing.

The inner-spring mattress did not attain any degree of popularity until about 1928 when a cheap inner-spring mattress was first produced commercially. The large scale production of inner-spring mattresses was a relatively new business in 1937 when Gleason applied for his patent. There is evidence that some of plaintiff's most successful competitors are making inner-spring mattresses today in essentially the same way that they were made prior to 1937.

■ Plaintiff's outstanding sales record seems to be attributable in large part to the following factors: (1) the general increase in demand for inner-spring mattresses, (2) more particularly, the increase in demand for cheap inner-spring mattresses,

and (3) an intensive advertising campaign and expertly organized sales department. This is substantiated by the fact that other types of inner-springs have not been outmoded or forced off the market by plaintiff's product. There is no evidence of a long existing and unsatisfied demand that would indicate that many had tried and failed to achieve the Gleason result, and evidence of large sales is relevant only as an indication of previously existing demand, not as evidence of public acceptance of the particular product. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997.

No helpful inference can be drawn from the fact of infringement standing alone; it is probably evidence of plaintiff's sales leadership in the field but not necessarily of invention.

The actual changes in the prior art made by the Gleason patent are simple, and the peculiar qualities of all of the elements of the assembly have long been known to those skilled in the art of making springs. No new use for those elements has been found, nor does the thing conceived by him differ in any substantial way from the relevant prior art. The Gleason patent may present a difference noticeable to some buyers so that they prefer to use the Gleason structure, but that again is not invention.

In this connection the words of the Supreme Court in the early case of Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 are apposite: "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures." See also Slawson v. Grand Street, P. P. & F. Railroad Co., 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576; Paramount Publix Corp. v. American Tri-Ergon Corp., supra; Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

In the recent case of United Specialities Co. v. Industrial Wire Cloth Products Corp., 186 F.2d 426, 428, the Court of Appeals for the Sixth Circuit, quoting in part from Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, held: "(The A and P case) is a mandate for us to scrutinize combination patent claims with a care 'proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to substract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.' "

In United Specialities the patent was invalidated on the basis that all of its elements were, in the words of Judge Simons speaking for the court, "to be found in the prior art in an identical or analogous environment * * * [It] has never been thought that mere difference of degree denotes invention except, perhaps, in those rare cases where the difference in degree is so marked and involves the solution of a problem long recognized but not earlier solved, so that a difference in degree becomes, in effect, a difference in kind." 186 F.2d at page 429. The Gleason patent does not present one of those rare cases referred to by Judge Simons and must therefore be found to be invalid for want of invention.