## S. D. WARREN CO. v. NASHUA GUMMED & COATED PAPER CO.

### Civ. A. 51–1117.

United States District Court
D. Massachusetts.

June 18, 1952.

George P. Dike, Robert S. Sanborn, Dike, Thompson & Sanborn, Boston, Mass., for plaintiff.

A. G. Miller, New York City, Emery, Booth, Townsend, Miller & Weidner, Boston, Mass., for defendant.

FORD, District Judge.

This is a suit by the S. D. Warren Company, hereinafter called Warren, for a declaratory judgment that U. S. Patent No. 2,462,029 with a title "Adhesive Compo-

sitions", issued February 15, 1949 to Lloyd M. Perry and assigned to the defendant, hereinafter called Nashua, is invalid and not infringed by Warren's two processes for an adhesive film that are set out in the complaint. Nashua counterclaimed, denied invalidity, and charged infringment. Claims 1–7, inclusive, of the Perry patent are in suit.

The Perry patent relates, as he states, to adhesive films or compositions and to articles, such as labels, adhesive tapes, etc., having an adhesive coating, and the object of the invention is to provide in such film or coating a novel physical or mechanical relationship of its components whereby it will have properties, particularly those made available by change in such relation at certain imposed temperatures, which will be advantageous in practical use. No chemical reaction is involved in Perry's process, the interaction of the substances or components employed is, as stated, mechanical or physical.

Perry's purpose was to provide a solid potentially adhesive film, which may be a coating on an article serving as a carrier for the film or intended to be attached by the film to some other article, as, for example, a sealing tape, a label or the like, which film is substantially unalterable and non-tacky at room or storage temperatures but which when activated by heat will become fully adhesive and although thereafter cooled to a temperature substantially below such activation temperature will at such lower temperature remain tacky for a usefully prolonged period of time. Perry characterized his invention in the specification, as follows: "In a sense it might be said that initial non-tackiness and the fact that the material after having once been heated will thereafter become sticky at a temperature substantially lower than at such first heating characterizes the invention." And he stresses the fact that his invention lies in the physical relation or mechanical correlation of suitable components, in the form of the composition, rather than in the exact identity of the component ingredients.

If we now advert to Claim 1 of the patent, which is typical, we can better understand

the main characteristics of Perry's invention. Perry Claim 1 reads:

1. As an adhesive a normally solid, megascopically homogeneous film, non-tacking at room temperatures and activatable to adhesiveness by heat, comprising a plurality of normally solid materials substantially compatible to merge on heating to provide a substantially homogeneous mass, one of the materials being an amorphous, potentially viscid, polymeric material and another a potential plasticizer for the same, the latter being present in the form of discrete crystalline particles intimately mechanically admixed in the film in substantially uniform proportions throughout the mass of the film, the plasticizer particles and the polymeric material coexisting in physically independent individuality, but merging on heating with release of the latent plasticizing property of the particles, the plasticizer being present in significant proportion to provide after heating a merged mixture having a temperature of adhesiveness, subsequent adhesive temperature, at least 10° F. lower than the temperature of adhesiveness, initial adhesive temperature, of the original film before such heating.

As seen, Perry starts out with a film non-tacking at room temperature so that the labels or sheets will not block or stick to each other if superimposed at that point. The polymeric material in Perry's composition is relatively hard and softens on the application of considerable heat. The plasticizer is in solid form and separate and does not in solid form affect the polymeric material of the film. Upon heating, the plasticizer melts, the polymeric material or resin and the plasticizer dissolve or merge one in the other and the resultant compound is plasticized or softened. After cooling, the compound or merged mixture is for a substantial time essentially a softer material and sticky at a lower temperature, even at room temperature. In the second state, subsequent adhesive temperature, it displays the known phenomenon of super-cooling. Perry did not claim in any way that super-cooling was new. He stated in his specification:

"From analogy with the known melting properties of mixtures of crystalline materials and by analogy with the phenomena of super-cooling, I incline to the belief that any composition containing crystalline discrete particle components on the one hand and resinous or polymeric adhesive compounds on the other, if the components be substantially compatible or soluble one in another after melting together, will have to some degree this latent property of becoming plasticized. However, assuming that this is a general physical law, my invention contemplates the useful application thereof in the practical arts in compositions wherein this property is present in a significant degree as evidenced by a subsequent threshold tack temperature that is 10° F. or more lower than the initial threshold tack temperature and, furthermore, as evidenced by a subsequent adhesive temperature that is 10° F. or more lower than the initial adhesive temperature determined in the manner above described. Furthermore, the plasticizing effect to be practically useful should persist for a substantial period of time even although eventual crystallization out of the plasticizing ingredient may occur. A plasticizing effect persistent through a reasonable time of handling is of practical utility."

Such a result obviously affords more time for joining.

Perry illustrates by varying examples (48) in his patent a composition in accordance with the principles of the invention and a typical one appears as Example A. Other examples show how the amounts of crystalline component relative to the amount of adhesive component may be varied and still show plasticizing effect.

"Example A

| | Parts |
|---|---|
| "Indene resin (potentially adhesive ingredient) | 45 |
| Ethyl cellulose (20 c.p.s.) (potentially adhesive ingredient also here serving as a binder) | 10 |
| Diphenyl phthalate (plasticizer) | 45 |
| Ethyl alcohol | 158" |

Indene resin and diphenyl phthalate are insoluble in alcohol.

This coatable composition, as Perry states, is deposited as a film or layer and, dried by evaporation of the alcohol at a relatively low temperature, the composition is stuck to the paper. After drying, the composition is opaque and consists of discrete particles of diphenyl phthalate and indene resin bound together by the ethyl cellulose which is soluble in alcohol. The temperature of incipient tackiness before heat activation is approximately 140° F. After activation and subsequent cooling, the temperature of incipient tackiness is approximately 100° F. The adhesion temperature initially required is approximately 165° F. After activation and subsequent cooling, the adhesive temperature is approximately 125° F.

Perry makes no contention that thermoplastic adhesive film coatings were new in the art. But the thermoplastic adhesives of the prior art were limited in usefulness because the temperature initially required to render the composition adhesive had to be maintained throughout the period of adhesive joining. It was customary in the art to make the adhesive juncture while the heated element was in firm contact with the back of the adhesive coated carrier element. Pressure sensitive type coatings employed before Perry had the disadvantage of being sticky when initially made and when subsequently subjected to normal temperatures of storage and handling. Perry taught that by a proper choice of ingredients it is possible to provide compositions which are non-tacky before adhesive activation under normal conditions of storage and handling and after activation will remain adhesive at room temperature or lower without further heating for a substantial time—adhesive sufficiently at room temperature to break the surface of a piece of 60-pound Kraft paper, rather than the adhesive juncture.

Also in the prior art many of the adhesives were prepared by forming the film either by heating together the components or by the employment of a common solvent, which method Perry expressly disclaimed in his patent. As he states: " * * * if the plasticizing property is to be latent in the original composition with the crystalline components initially and up to the time of heat activation dispersed in solid discrete particle form substantially undissolved in or by the components the employment of a common solvent or heating the component is precluded." Perry in his Example B points out the results where the components compounded in Example A according to his teaching are compounded in a common solvent. In this composition the temperature of incipient tackiness before heat activation is substantially the same as that obtained after activating. Also, he points out, the adhesive temperature required initially is substantially the same as the adhesive temperature required after activation and subsequent cooling. As Perry states, the plasticizing effect of diphenyl phthalate is evident in Example B equally before and after heating. In Perry's Example A there is evident, both from the temperature of incipient tackiness and from the adhesive temperature, the existence of a very definite plasticizing property made available after heating but which is held latent before such heating. Also it may be noted, as Perry points out, the temperature of incipient tackiness in Example B—at approximately 100° F.—might cause trouble during storage handling in summer weather, whereas in Example A, as set forth before activation, the corresponding temperature is 140° F. which provides ample margin in summer weather—a decided advantage in storage and handling. As already set forth, thermoplastic adhesive compounds in the prior art have been limited in their usefulness, as Perry points out, because the temperature initially required to render the composition adhesive had to be maintained throughout the period of adhesive joining. It was customary to make the adhesive junction while the heated element was in firm contact with the back of the adhesively coated carrier element. Temperature drop in the old composition caused, at times, imperfect joints. In Perry's composition the subsequent adhesive temperatures, after being initially activated before the adhesive joining, made possible faster adhesion joining and better joints.

Perry's invention, I believe, has been sufficiently explained to lead to the conclusion and finding that his compositions have utility in providing films that furnish good adhesive joints with their initial non-tackiness and their latent plasticizing property to cause lowering of the adhesive range in a substantial amount (10° F.) and those in which such lowering of the adhesive range persists for a substantial length of time (10 minutes). All the examples in Perry's patent were tested by the procedure described and the results are set forth in the patent. All showed a lowering of the effective adhesive range.

Was Perry's composition novel? Warren argues that the prior art fully describes Perry's conception, not only of the result to be achieved, but also the manner in which to accomplish it. I disagree.

Warren relies principally upon four patents, not cited in the Patent Office: Catlin, 2,342,387; Findley, 2,381,946; Strother, 2,316,371; and Patton, 2,385,879. None of them teaches what Perry did. Findley, the most pertinent, did not produce a film in any form. He did produce a thermoplastic adhesive composition by melting a resin, a plasticizer (hydrogenated oil, wax and an anti-oxidant) which when heated up got sticky and was used while in the latter state by applying dots of the adhesive to a surface upon which a label is placed before it cools. When allowed to solidify it melted at same point where it first melted. Although the super-cooling phenomenon is present in the compositions of the prior art (Findley) there is no suggestion of the utilization of it to provide a new and different adhesive and teaching how it could be so utilized, as disclosed in Perry. Findley's material does not, as Perry, after cooling melt at a lower range. It acts the same way on reheating after cooling. The temperature differences in Perry's composition are not found in Findley nor in the prior art.

With respect to the other patents relied upon, it is enough to say that Catlin did not teach how to manufacture an adhesive film with a latent plasticizing property; Patton discloses a composition for surgical and medical preparations—an improved thermoplastic cast material. Here there is no utilization of the super-cooling phenomenon. Even though Patton discloses a composition of a resinous base material to which a suitable plasticizing material is added, there is no disclosure of the physical correlation of the materials used nor any quantitative relationship to disclose the properties outlined in the Perry claims. Strother's molding material teaches nothing about, and makes no use of, the delayed tack action as in Perry. Certainly Strother does not read on Claims 2 and 7 of the patent in suit which include the delayed tack action. Nor does Strother read on the other claims in any way I can determine.

■ Did Perry's procedure and product involve invention? I find and rule they did. There is no question a real advancement in the art was contributed. The product or composition of Perry involved ingenuity beyond the work of a skilled mechanic. There was nothing comparable to it in the prior art. Its advantages have been sufficiently described and the results achieved were of great benefit to the art. The useful application of super-cooling is outstanding in the art. No one evidently utilized it before as Perry. Cf. Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683. Measured by the standard set down in Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, Perry shows patentable discovery or invention.

The finding and ruling is that the Perry patent is valid with respect to all claims in suit.

## Infringement.

In January of 1949, one Wiswell, a research chemist in Warren's employ, began to look into the making of heat seal coatings. Before this time Warren was not making heat sealed papers. Perry's patent was not issued until February 15, 1949. Mr. Wiswell knew early in 1949 that Nashua was making delayed action, heat seal paper and he was attempting to produce something legitimately competitive. In June of 1949, one Smith, a chemical engineer, who had been in the employ of Nashua and in charge of the commercialization of the heat seal label adhesive of

Nashua, became associated with Warren. He was familiar with the Perry formulas which Nashua was using in its heat sealed paper and went to work for Warren with Mr. Wiswell, Warren's research chemist, on Warren's heat sealed adhesive program. Thereafter, Warren produced its material, which Nashua claims infringes Perry. These circumstances brisk up our inquiry.

Warren's procedure is described in detail in the complaint. The components or ingredients of Warren's coatings, Specimens 1 and 2 are set forth in the complaint. These ingredients in Warren's coating film are set forth as diphenyl phthalate, indene resin, pentalyn G resin, A 56 resin, styrene-butadiene resin and polystyrene resin. The diphenyl phthalate is a crystalline material, the others are amorphous, potentially viscid, polymeric material. The diphenyl phthalate is compatible with the amorphous materials as defined in the specification and claims of the patent in suit. Warren makes two fusion products of Specimen 1. In the first, which it calls a High Plasticizer Fusion Product A, the ingredients are fused at about 300° F. then cooled slowly until solid and ground to form powder in a hammer mill. This specimen has a high proportion of plasticizer and a low proportion of resin. A second fusion, which Warren calls Low Plasticizer Fusion Product B, is made by Warren with reversed amounts of the same ingredients and parts of both solid fusions are then made into an aqueous slurry and then coated on paper and the paper is dried. Specimen 2 of Warren is made of a mixture of the fusion Product A, a resin and a binder. There is produced in Specimens 1 and 2 of Warren a solid, megascopically homogeneous film comprised of a plurality of normally solid materials, non-tacky at room temperature and ready for activating to adhesiveness by heat. In both Warren Specimens 1 and 2 the initial adhesive temperature is 145° F. the subsequent adhesive temperature 70° F. far in excess of Perry's 10° F. difference of subsequent adhesive temperature.

There is no doubt that the Perry product and Warren's Specimens 1 and 2 are composed of similar ingredients having the same function and the same characteristics

and features. Warren cannot escape the fact they have used the principles and appropriated the substance embodied in the Perry patent. Cf. Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d 729, 731. The Warren products Specimens 1 and 2 embody the same results as set forth in claims 1, 3, 4, 5, and 6, and, as later demonstrated, the mode of operation employed in producing Warren's products is substantially the same as Perry's. They plainly infringe claims 1, 3, 4, 5, and 6.

Claims 2 and 7 are different from claims 1, 3, 4, 5, and 6, in that Perry claims a product, "which after subsequent cooling will have and retain for a substantial period an adhesiveness permitting its application at room temperature without renewed application." Specimen 1, the evidence of Nashua's expert showed, after activation and subsequent cooling, is "sufficiently pressure-sensitive to be put down with light finger pressure at room temperature." Thus Specimen 1 of Warren infringes claims 2 and 7. Specimen 2 of Warren, it is conceded, is not pressure-sensitive at room temperature and does not infringe claims 2 and 7.

But, argues Warren, Perry's claims are limited in column 4, lines 50–54, of the specification, which read: "* * * the formation of the film either by heating together of the components or by the employment of a common solvent, one or the other of which steps is utilized in preparing many adhesives in the prior art, is precluded."

Warren also points out that Perry in describing his composition states: "In such composition we may distinguish as a primary constituent a potentially viscid ingredient of a resinous or polymeric nature * * * and as another primary constituent an ingredient consisting of one or more components of a crystalline character which are present in the form of discrete particles dispersed in the composition as a whole." Perry states, argues Warren, that these components coexist in the composition in mechanical mixture but physically and chemically are separate from each other, retaining their physical individuality until activation takes place, when they are

united physically as well as mechanically. From this, Warren contends, that what Perry was attempting to do was to avoid impact on the prior art where thermoplastic adhesive compositions made by fusing were old and for this reason he inserted in his claims the phrase "co-existing in physically independent individuality." The argument goes on as follows: this phrase means that the claims are limited to a coating having a mechanical mixture of the original ingredients in physically independent form, not merged until heated after the coating has been applied to the paper base, and do not embrace a coating in which the ingredients have already been fused in the preparation of the coating as Warren does in preparing its product. In brief, Warren claims its coating lies in the field which Perry disclaims; that it is a fusion product; that it made a successful potentially adhesive coating for labels by doing what Perry said in the specification "is utilized in preparing many adhesives in the prior art * * *." It contends that Perry did not realize that a fusion product of a high proportion of plasticizer to resin could be brought to a useful state of equilibrium for use as a useful non-tacky potentially adhesive ingredient in the art; that Perry exhibited this lack of realization when his counsel stated in the Patent Office proceedings on page 70 that "It remained for the present applicant to conceive that if the materials were intimately mixed in discrete particle form they might be utilized to provide a potentially adhesive film wherein such capacity for super-cooling was exhibited in such substantial degree as to have useful results in the adhesive field." Also on page 87 of the File Wrapper, where it is stated, in referring to Example 3a in the specification where 75 parts of plasticizer and 25 parts ethyl cellulose are used, that "A label coated with an adhesive having the same components as in the example, prepared as in the prior art by depositing them from a common solvent or by melting them together, and, therefore, like applicant's adhesive After [sic] activation, would have a temperature of adhesiveness of about 117° F. which would be useful. However a threshold tack of 65° F. or even

more would be inadmissible. Under ordinary conditions of use the labels could not be stored in a magazine or wound in a roll without one sticking to another, and in being handled they would gum up the machine." The statements in the quotations were described as correct by Perry in his deposition which was offered and received in evidence at the trial.

Analyzing the argument of Warren which has been set out in rather complete form, it would seem that Warren takes the position it does not infringe Perry because (1) it fused the resin and the plasticizer to prepare its coating before it was laid on the paper, which it says, Perry disclaimed, and (2) as a result of this it did not have what Perry in the final solid form had, namely, the plasticizer particles and the polymeric material coexisting in physical independent individuality and which did not merge until activation. In other words, with respect to (2), it is Warren's contention that the separate particles of plasticizer in Warren have been merged—the plasticizing has already been done by the fusion before the coating was put on the paper. Warren contends, for the reasons stated, that its coating is different from Perry's in fundamental concept and composition.

The key to the problem lies in the proper construction of the disclaiming phrase in Perry's patent, where he says "* * * the formation of the film either by heating together of the components or by the employment of a common solvent, * * * is precluded." If Perry meant to exclude merging certain components by physical fusing before the material is applied to the paper from an aqueous dispersion, there is some force in Warren's contention. If Perry meant by the phrase "formation of the film", the formation of the film on the paper to be employed as a label, then there is no merit in Warren's contention, since Warren does not form its film on the paper by fusing; it forms it from a dispersion of solid materials.

What did Perry mean to exclude? He was referring, as is evidenced from what follows in the specification, to the *formation of film* by heating all the components or by employment of a common solvent, as

exemplified in the prior art, to which he makes direct reference. In the prior art, films were laid down on the label from a hot melt, as in Findley, No. 2,381,946, and also from a common solvent, while in both Perry and Warren the film is coated on the paper from an aqueous slurry and not laid down on paper from a melt, or, to put it another way, fusing material on the paper to form the film. It is true that certain, not all, of the components in Warren's dispersion have been fused at some time prior to placing the film on the paper, but it is difficult to agree that this is of any importance because the fact remains that the crystalline component, which is Fusion Product A of Warren (conceded by Warren's expert to be dirty diphenyl phthalate), initially and up to the time of heat activation is dispersed in solid discrete particle form, substantially undissolved in or by the other components. (Tr. p. 323) Perry was disclaiming a procedure where all the components were fused to form the film. In fact, Perry's expert pointed out, and I find it to be a fact, that certain of Perry's components were produced by fusion. These later were placed in the dispersion. For example, Perry's diphenyl phthalate, the crystalline plasticizer, is prepared by a fusion of phthalic anhydride and Phenol to form a new product and Pentalyn G is prepared by fusing resin essentially and pentaerythritol. A 56 is also a resin produced by fusion. Also in Perry's Example A, as Dr. Norman disclosed, the ethyl cellulose, one of the components of the film, is dissolved in alcohol and about ten per cent of the diphenyl phthalate is in solution when applied to the paper. In Perry the portion of the diphenyl phthalate which is in solution merges with the ethyl cellulose, partially plasticizes it, and remains with it when it is deposited on the paper (cf. Warren's Fusion Product B) and the insoluble portion of the phenyl phthalate remains in physically independent form. Perry was not excluding in the patent the type of fusion present in Warren's process. It is true that these fusions Nashua describes are chemical and not physical, as in War-ren, but they are present in the products of both, although not mentioned in Perry, and Warren's fusions can hardly be claimed as teaching any new mode of operation.

Warren argues that its coating is different from Nashua's since because of fusing components before putting the film on the paper, it does not have original discrete or separate crystals in a mechanical mixture as Perry; that the original crystals disappear in fusing and any crystals present in its coating are entirely new and the result of the prior fusion and are not pure plasticizer crystals in the sense of Perry's claims. I cannot concede there is any substance to this contention in the light of Dr. Buerger's testimony. (Tr. pp. 371, 373, 377) What Warren makes and sells is not a fusion product coated on paper, it is a mechanical mixture of particles of the fusion product with particles of a number of amorphous polymeric ingredients. The crystalline particles in Warren's Fusion Product A are mechanically admixed with the polymeric material and possess potential plasticizing properties, the same as Perry's. They are not merged until activated and up to that point, as in Perry, are physically independent. There is no dissimilarity from Perry in this respect and it follows that Warren's contention that its mode of operation is different from Perry's because Warren's particles do not need to merge with each other since each particle by itself becomes adhesive when heated, whereas Perry's particles of plasticizer must merge with his particles of resin before his coating becomes adhesive is without merit.

The conclusions from the above are that the Perry patent in suit is valid and infringed by Warren. Judgment will be entered accordingly.

The judgment for Nashua will also include an injunction restraining Warren from any further infringement as prayed for in Nashua's counterclaim; also an order for an accounting by Warren to Nashua. Warren's complaint is dismissed. Costs to Nashua.